Filed 7/12/13  In re A.D. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

| | |
|---|---|
| In re A.D. et al., Persons Coming Under the Juvenile Court Law. | |
| SACRAMENTO COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>L.A.,<br><br>Defendant and Appellant. | C072659<br><br>(Super. Ct. Nos. JD230818 & JD230819) |

L.A., mother of the minors, appeals from orders of the juvenile court terminating her parental rights.  (Welf. & Inst. Code, §§ 366.26, 395.)[1]  Appellant contends the court and the Sacramento County Department of Health and Human Services (Department) failed to comply with the notice provisions of the Indian Child Welfare Act (ICWA). (25 U.S.C. § 1901 et seq.)  Appellant further asserts that the court erred in terminating her parental rights because there was insufficient evidence the minors were likely to be adopted in a reasonable time.  We affirm.

_____

[1] Further undesignated statutory references are to the Welfare and Institutions Code.

1

FACTS

The minors, 5-month-old A.D. and 23-month-old R.D., were removed from parental custody in July 2010 due to domestic violence in the home. Both appellant and the minors' father were Alta California Regional Center clients and had mental health issues which affected their parenting. In September 2010, the court found jurisdiction, adjudged the minors dependents, and ordered the parents to comply with the case plan. The minors were placed with the maternal great-aunt.

The review reports disclosed that both A.D. and R.D. had developmental delays and were eligible for child development services from Alta California Regional Center and speech therapy from Easter Seals Disability Services (Easter Seals). R.D. had additional emotional and behavioral issues, was easily over-stimulated, and did not know how to calm herself or interact appropriately with others.

After 6 months of services, A.D. no longer needed physical therapy, but remained in child development services for work on her cognitive, social, emotional, and communication delays and had in-home services from Easter Seals. A.D.'s delays ranged from 2 to 11 months. Due to her global development delays, R.D. was referred to a neurologist who ordered a magnetic resonance imaging (MRI) test. Her neurological status remained unclear. Due to her age and progress she no longer qualified for services from Alta California Regional Center but could receive any necessary services through the school district. She faced discharge from the Easter Seals program due to lack of participation by the caretaker who then re-engaged with the program. R.D.'s delays ranged from 10 to 16 months. The caretaker reported both minors had difficult behaviors including playing with feces, but these behaviors were generally not seen by service providers. The social worker assessed that both minors had special needs and were specifically adoptable. A maternal aunt was assessed for possible placement of the minors and had several visits with them. During their visits the minors slept well and R.D. did not play with her feces.

The 18-month review report filed in January 2012 stated A.D. was still participating in Alta California Regional Center and Easter Seals services and was 9 to 18 months delayed. R.D. was being assessed by the school district for her global delays. In December 2011 the minors were placed in respite care when the maternal great-aunt was out of town. The respite care provider said that the minors were high maintenance and found them challenging despite her experience and the assistance of staff. The minors were removed from the relative placement with the maternal great-aunt's consent and placed in foster care in February 2012. Appellant failed to reunify after 18 months of services and the court set a hearing pursuant to section 366.26 to select a permanent plan.

The July 2012 report for the section 366.26 hearing stated that A.D. remained an Alta California Regional Center client for services to address her delays. Her skills had improved and her delays now ranged from zero to nine months. She still had some cognitive delays and behavioral issues. R.D. also had some cognitive and behavioral issues and was to begin Early Head Start to address her speech and language delays. The current caretakers were interested in adopting the minors who had been in their home for five months. An adoption home study was in progress. The court continued the section 366.26 hearing to secure additional information on the home study.

An addendum filed in October 2012 stated both minors were now meeting their physical milestones and showed good motor skills. A.D. was more advanced linguistically and R.D. remained language delayed but both minors had shown improvement. Similarly both minors were showing behavioral improvement and increasing ability to cooperate with directions. The caretakers continued to work with therapists and specialists to address the minors' difficult behaviors. R.D. remained the more challenging of the two. The caretakers had completed all the necessary paperwork for the adoption home study and it was anticipated that the home study would be completed in December 2012.

At the section 366.26 hearing the court stated: "One of the things I am also considering is that the Court had some concerns and was not convinced that there was clear and convincing evidence regarding the children's adoptability based upon the report that was presented in July." The court referenced the minors' delays and behavioral issues, the short time they had been in the foster home and whether the caretakers fully appreciated the minors' special needs. The court noted that since then, the Department submitted additional evidence which indicated the minors continued to be maintained in the foster home, the caretakers remained committed to them and had followed through with the home study process. The court concluded that it was now possible to find by clear and convincing evidence that the minors were likely to be adopted by the current caregivers who were familiar with the disabilities and delays the minors had and accepted them. The court terminated parental rights.

Facts relating to the ICWA issue appear in the subsequent discussion on that point.

DISCUSSION

I

Appellant contends substantial evidence does not support the court's finding that the minors are likely to be adopted within a reasonable time.

When the sufficiency of the evidence to support a finding or order is challenged on appeal, even where the standard of proof in the trial court is clear and convincing, the reviewing court must determine if there is any substantial evidence--that is, evidence which is reasonable, credible, and of solid value--to support the conclusion of the trier of fact. (*In re Angelia P*. (1981) 28 Cal.3d 908, 924; *In re Jason L.* (1990) 222 Cal.App.3d 1206, 1214.)

Determination of whether a child is likely to be adopted focuses first upon the characteristics of the child. (*In re Sarah M*. (1994) 22 Cal.App.4th 1642, 1649.) A child who might be considered unlikely to be adopted due to some disability may nonetheless be found adoptable if a specific prospective adoptive parent or family is willing to adopt

4

the child. (*Id*. at p 1650.) Courts often refer to a child who is likely to be easily placed because the child is healthy, young, and without significant behavioral or other problems as "generally adoptable" and to a child who may be difficult to place due to age, medical, emotional or behavioral problems as "specifically adoptable," thereby indicating that the child is only likely to be adopted within a reasonable time by a specific caretaker who has been identified. In either case, the reviewing court will affirm if substantial evidence establishes the likelihood that the child will be adopted within a reasonable time. (*In re A.A.* (2008) 167 Cal.App.4th 1292, 1313.) Such evidence exists in this case.

Both minors had significant developmental delays when they entered foster care. The relative caretaker was not diligent in seeing that they got the necessary services to remediate those delays but both made some progress in her care. After the minors were placed with the current caretakers, their physical delays resolved to the point where support services on those issues were not required and both minors made significant progress in other areas. A.D. had made greater overall progress than had R.D. in language skills and cognition, but it was apparent both minors remained specifically, rather than generally, adoptable.

At the first section 366.26 hearing, the minors had not been with the current caretakers very long and the level of the caretakers' understanding of the minors' special needs and their commitment to the permanent care of the minors was unclear. However, by the second hearing, the current caretakers had many more months of dealing with, and meeting, the minors' special needs. Their ongoing commitment to the minors was apparent in their zeal in engaging in services for the minors and working with service providers to resolve the minors' issues insofar as was possible. Further, the caretakers had completed the paperwork for the adoption home study, showing their intent to provide permanence to the minors. There was no evidence to suggest the home study would not be approved. The evidence amply supports the juvenile court's finding that the minors were likely to be adopted by their current caretakers in a reasonable time.

5

Appellant contends the court erred in failing to require notice to the Pomo Indian tribe(s) because the father claimed Pomo ancestry and a relative, Aunt Vicky, who may have had information on the matter was not located and questioned by the Department. Appellant further asserts that the Department should have obtained the date and place of death of the paternal grandmother when speaking with the paternal grandfather.

a) Facts

After the petitions were filed, each parent filed an ICWA-020 form (Parental Notification of Indian Status). Appellant did not specify a tribe but indicated she might have Indian ancestry. Father claimed no Indian ancestry. The detention report stated that appellant did not know if she had Indian heritage. The father said that his mother (the paternal grandmother) had Pomo Indian ancestry, she was deceased, and he had no further information. When questioned by the court at the detention hearing, appellant suggested she might have Cherokee heritage. The father said the paternal grandmother was born in Santa Rosa and she and his Aunt Vicky told him they had Pomo Indian heritage but were not enrolled. The court ordered both parents to complete an Indian questionnaire and the Department to send notice to any tribe which was disclosed as a result of the inquiry.

In August 2010, a declaration by the paralegal assigned to investigate ICWA claims stated that he had not received a questionnaire from appellant but sent notice to the Cherokee tribes with the information he had available. The declaration did not mention the Pomo tribe or father. Shortly thereafter, father filed an ICWA-020 form in which he claimed Pomo Indian heritage. The court directed the parents to go directly to the social worker's office and provide whatever information was necessary to complete the notice forms.

As a result of interviewing the parents, the paralegal filed a second declaration stating that an amended notice was sent to the Cherokee tribes. At the interview,

6

appellant disclaimed all Indian heritage based on her conversations with a relative knowledgeable in her family history. The father also now disclaimed any Indian heritage. Because the father was not confident of the veracity of statements made about his Indian heritage by the paternal grandmother, he called the paternal grandfather during the interview. The paternal grandfather could not recall any specific Indian heritage for himself or the paternal grandmother, his estranged wife, other than the possibility of Cherokee heritage on the paternal grandmother's side. The father and paternal grandfather provided family tree information and the paralegal sent an amended notice of the proceedings to the Cherokee tribes.

In September 2010, the paralegal reported that the Cherokee Nation and the United Keetoowah Band of Cherokee Indians had responded to the notice and indicated that the minors were not members or eligible to become members of the tribes. In October 2010, the Eastern Band of Cherokee Indians also responded that the minors were not members or eligible to become members of the tribe.

At a hearing on October 28, 2010, the court reviewed the history of claims of Indian heritage which were made, the Department's inquiry and notice, and the responses of the three Cherokee tribes. The Department confirmed that no notice was sent to the Pomo tribes based on the paternal grandfather's disclaimer of any connection through himself or the paternal grandmother to that tribal group. The court found the minors were not Indian children and that the ICWA did not apply.

b)  Notice to the Pomo Tribes

The ICWA protects the interests of Indian children and promotes the stability and security of Indian tribes by establishing minimum standards for, and permitting tribal participation in, dependency actions. (25 U.S.C. §§ 1901, 1902, 1903(1), 1911(c), 1912.) The juvenile court and the Department have an affirmative duty to inquire at the outset of the proceedings whether a child who is subject to the proceedings is, or may be, an Indian child. (Cal. Rules of Court, rule 5.481(a).) If, after the petition is filed, the court "knows

7

or has reason to know that an Indian child is involved," notice of the pending proceeding and the right to intervene must be sent to the tribe or the Bureau of Indian Affairs (BIA) if the tribal affiliation is not known. (25 U.S.C. § 1912; § 224.2; Cal. Rules of Court, rule 5.481(b).)

It is not necessary that the child's Indian status be certain to implicate the notice requirements of ICWA. (*In re Desiree F.* (2000) 83 Cal.App.4th 460, 471.) It is the province of the tribe, not the court, to determine whether the child is eligible for membership in the tribe. (§ 224.3, subd. (e)(1).) However, there are circumstances under which notice is not required, i.e., the information may be too vague or speculative or a parent may retract the claim of Indian heritage upon further investigation of the facts in the case. (*In re O.K.* (2003) 106 Cal.App.4th 152, 157 [information too vague]; *In re Jeremiah G.* (2009) 172 Cal.App.4th 1514, 1520-1521 [father retracted his assertion of Indian heritage].)

Here, although father initially claimed Pomo heritage based on what the paternal grandmother and Aunt Vicky told him, he later concluded the information was questionable and disclaimed any Indian ancestry. To ensure accuracy, the father called the paternal grandfather during his interview with the ICWA paralegal. The telephone call clarified that he did not have Pomo heritage but might have some Cherokee heritage through the paternal grandmother.

Appellant now asserts that the father, due to his mental health and disability issues, was not a good historian and the Department had a duty to track down Aunt Vicky and question her. There is no evidence in the record that the father's disabilities impaired either his capacity to provide information to the social worker and paralegal or his judgment in questioning the veracity of the information provided by the paternal grandmother. The telephone call to the paternal grandfather corroborated the father's denial of Pomo ancestry. There is also no suggestion that Aunt Vicky would have had better information that the paternal grandmother, whose claim was questioned by the

8

father and considered to be unfounded by the paternal grandfather.  Given that the Department sent notice to the Cherokee tribes on information that was quite vague, notice certainly would have been sent to the Pomo tribes had father not retracted his claim of Pomo heritage.  However, he did retract the claim and notice was not required.

c)  Statistical Data on the Paternal Grandmother

Appellant also faults the Department for failing to secure information on the paternal grandmother's date and place of death when the paralegal was speaking with the paternal grandfather.  The paralegal's function is to investigate reports of Native American ancestry and provide notice to the identified tribes.  We may presume that his official duty, in this case, asking detailed questions to fill in the blanks of the notice form, was regularly performed.  (Evid. Code, § 664.)  In any event, it was unlikely that the paternal grandfather, who was estranged from the paternal grandmother, would have information on her date and place of death.  The paternal grandfather clearly provided the generational information in his possession which permitted the paralegal to complete the notice form with some information about the father's ancestry up to, and including, the four great-grandparents.  There is no evidence further information was available.

The record shows that the relevant tribes were provided notice of the proceedings with all available data about the minors' ancestors.  There was no error.

DISPOSITION

The orders of the juvenile court are affirmed.


    BLEASE       , Acting P. J.

We concur:


    HULL       , J.


    BUTZ       , J.