Filed 9/5/14  In re R.R. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re R.R. et al., Persons Coming Under the Juvenile Court Law. | |
| TULARE COUNTY HEALTH AND HUMAN SERVICES AGENCY<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MICHAEL R.,<br><br>Defendant and Appellant. | F068972<br><br>(Super. Ct. Nos. JJV06081A, JJV06081B, JJV06081C, JJV06081D, JJV06081E)<br><br>**OPINION** |

### THE COURT[*]

APPEAL from orders of the Superior Court of Tulare County.  Hugo Loza, Commissioner.

Carol A. Koenig, under appointment by the Court of Appeal, for Defendant and Appellant.

Kathleen Bales-Lange, County Counsel, John A. Rozum and Carol E. Helding, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Kane, Acting P.J., Franson, J. and Chittick, J.[†]

[†]     Judge of the Superior Court of Fresno County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Appellant Michael R. (father) appeals from the juvenile court's order terminating his parental rights under Welfare and Institutions Code section 366.26[1] as to his five minor children, two daughters and three sons. Father contends there was insufficient evidence the children were adoptable. We affirm.

### PROCEDURAL AND FACTUAL SUMMARY

In March 2012, the Tulare County Health and Human Services Agency (agency) took father's five minor children into protective custody after his oldest child, his then 13-year-old daughter, confided to a school friend that father had been "raping" her since she was eight years old. She described "rape" as penile penetration. Father denied the allegation and his wife, the children's mother, said she did not believe it. The children were placed in two separate foster homes.

During its investigation, the agency discovered that father was physically abusive to all of the children. He struck them across their faces with the front and back of his hand and he struck his 11-year-old son with his hand and a belt on his lower back, buttocks and thighs. On one occasion, father burned this same son with a butter knife and slammed him against a wall. He struck his seven-year-old son with a belt and threw him against a door. He made the 11-year-old kneel down and instructed the seven-year-old to strike him.

In June 2012, the juvenile court conducted an uncontested jurisdictional hearing on a second amended dependency petition alleging father inflicted serious physical harm on the children and sexually abused the 13-year-old and that mother failed to protect the children. The juvenile court sustained the petition and ordered mother and father to participate in reunification services.

Also in June 2012, two of the children were moved so that all five children were in the same foster home. The foster parents already had two adopted children, ages 14 and

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

15. In order to accommodate the children, the foster father and the teenage adopted son moved in with a relative.

In July 2012, father was arrested on charges of sexual abuse. In October 2012, a jury found him guilty of six counts of child molestation (Pen. Code, § 288, subd. (a)), two counts of forcible child molestation (Pen. Code, § 288, subd. (b)(1)) and two counts of sexual intercourse with a child age 10 or younger (Pen. Code, § 288.7). He was sentenced to 88 years to life in prison. Mother remained loyal to father and maintained a relationship with him throughout his criminal proceedings.

In December 2012, at an uncontested six-month review hearing, the juvenile court terminated father's reunification services and continued mother's services to the 12-month review hearing.

In its report for the 12-month review hearing, the agency informed the juvenile court that mother made minimal progress in her reunification services. The agency recommended the juvenile court terminate mother's reunification services, set a section 366.26 hearing and select a permanent plan of adoption for the children with their foster family. The agency also informed the juvenile court that the maternal grandparents (grandparents) expressed an interest in having the children placed with them, but the agency was not assessing them because mother lived with them and they were close to family members who did not believe the children's allegations of abuse. The grandparents understood that the agency could not consider placing the children with them until they resolved the family situation.

In June 2013, following a contested 12-month review hearing, the juvenile court terminated mother's reunification services and set a section 366.26 hearing. Mother and father did not challenge the juvenile court's setting order by writ petition. (Cal. Rules of Court, rules 8.450 & 8.452.)

In its report for the section 366.26 hearing, the agency advised the juvenile court that the children were adoptable and wanted to be adopted. Under the heading of

"Analysis of the Likelihood of Adoption and Proposed Permanent Plan," the agency reported:

> "[A]n Adoptions Assessment was completed for the children …. The children were found to be adoptable…. The prospective adoptive parents have stated their desire to adopt the children and raise them as their own. The prospective adoptive parents are prepared and qualified to meet the children's emotional and physical needs….
>
> "Given the characteristics of the children including but not limited to their age, mental health status, general good health, etc., there are foster-adopt families that may be willing to adopt the children aside from the children's current prospective adoptive parents. All the children are in agreement with being adopted by the prospective adoptive parents."

The agency reported that the prospective adoptive parents had been married for 43 years, had two adopted teenagers and three adult children, two sons and a daughter, who lived in the area and provided support to the family. The adoptive parents stated they were capable of meeting the children's needs and understood the responsibilities of adoption.

In the fall of 2013, the agency and the court appointed special advocate (CASA) updated the juvenile court on the children. By this time, the children were 14 years old (eldest daughter), 13 years old (eldest son), 10 years old (youngest daughter), nine years old (middle son) and six years old (youngest child).

The eldest daughter was a freshman in high school. She was excited about being in high school and hoped to get a "fresh start." She was affiliated with the Tulare Salvation Army, as were all the children, and was active in teenage meetings and events. She was close to her foster mother's adult daughter, who stood by her and encouraged her during her father's criminal trial. Like her siblings, the eldest daughter was being treated for an adjustment disorder, anxiety, post traumatic stress disorder, depression and being an abuse victim. Through therapy and medication, her symptoms had been significantly reduced or eliminated. She was adamant about not reunifying with her mother and was angry at the relatives who did not believe her father sexually abused her.

4

The eldest son, an eighth grader, was described by the CASA as the "most closed of all of the children" and was just beginning to open up about the abuse in the home. He initially struggled with anger, aggression, sadness, anxiety and difficulty concentrating as he processed his sister's sexual abuse and his own physical abuse. However, he completed services to deal with his stress and aggression and he told his therapist he was feeling less anxious and sad. He continued to struggle, however, with anger and defiance in his foster home and at school. He was also struggling scholastically but was receiving tutoring and expressed a desire to do better.

The youngest daughter, a fifth grader, enjoyed school and loved to read. She was described as "pleasant to be around," "polite, engaging and expressive." However, she was also guarded and unwilling or unable to verbally process the abuse she and her siblings suffered. She was diagnosed with an eating disorder and was referred to a specialist who prescribed medication to increase her appetite. Her foster mother reported that she was anxious and urinated in her bed three times a week. She also had nightmares and visual and auditory hallucinations and vomited "over anything." During the summer of 2013, the youngest daughter wrote a note that had "suicide verbiage" and drew some "disturbing" pictures. The foster mother reported these concerns to the child's therapist.

The middle son, a fourth grader, was doing well in school. The CASA described him as a "bright, happy, friendly child who seems to get along with anyone." He was receiving therapy for "lying and annoying" his siblings, which his therapist attributed to the secrecy surrounding the reason for father's imprisonment.

The youngest child, a first grader, was also doing well academically. The CASA described him as "a very outgoing child [who] wants to talk to anyone and everyone and insists on being heard in every situation." His teacher reported that he is "often disruptive and off task in class." He was diagnosed with enuresis and encopresis but was making progress. The youngest child's therapist reported he was beginning to verbalize

sadness related to being detained and placed in foster care and had acted out behaviorally as a result, which his therapist considered normal under the circumstances.

The CASA recommended the juvenile court place the children with the prospective adoptive parents either under a plan of legal guardianship or adoption. The CASA also reported that the children enjoyed their visits with their grandparents, which occurred once a month for two hours. The visits were unsupervised and the grandparents took the children shopping or out to eat. The children seemed to look forward to the visits and showed "great affection" toward their grandparents.

In January 2014, the juvenile court convened the section 366.26 hearing. Father's attorney presented his case by argument only. Father's argument was that he wanted the children returned to their mother. If that was not possible, he wanted the children placed with any appropriate family member and was willing to relinquish his parental rights to facilitate such placement. He also asked for visitation and to be allowed to write to the children. Mother's attorney adopted father's request. Counsel for the minors advised the juvenile court that all five children wanted to be adopted. There were no objections lodged before the court as to any issue regarding adoption. The juvenile court found by clear and convincing evidence the children were likely to be adopted and terminated mother and father's parental rights.

This appeal ensued.

## DISCUSSION

Father challenges the sufficiency of the evidence to support the juvenile court's finding that the children are adoptable. He asserts (1) the children are not "generally adoptable" because they are a large sibling group and have emotional problems; (2) the foster mother does not qualify as a prospective adoptive parent because she did not complete a home study; and (3) the children are not "specifically adoptable" because the foster mother may have a legal impediment to adoption.

We conclude the foster mother's qualification as the children's prospective adoptive parent is irrelevant to their adoptability, and father forfeited the legal detriment question by failing to raise it at the section 366.26 hearing. We further conclude substantial evidence supports the juvenile court's finding that the children are adoptable.

"Once [the juvenile court] sets a hearing pursuant to section 366.26 to select and implement a permanent plan for a dependent child, the [agency] must prepare an assessment [citations], frequently referred to as an adoption assessment. Such an adoption assessment provides the information necessary for the juvenile court to determine whether it is likely the child will be adopted [citations] …." (*In re G.M.* (2010) 181 Cal.App.4th 552, 559 (*G.M.*).) The assessment must include "[a] preliminary assessment of the eligibility and commitment of any identified prospective adoptive parent." (§ 366.21, subd. (i)(1)(D).) "A child's current caretaker may be designated as a prospective adoptive parent if the child has lived with the caretaker for at least six months, the caretaker currently expresses a commitment to adopt the child, and the caretaker has taken at least one step to facilitate the adoption process. (§ 366.26, subd. (n)(1).)" (*G.M.*, *supra*, 181 Cal.App.4th at p. 559.)

In order to terminate parental rights, the juvenile court must find by clear and convincing evidence the child is likely to be adopted. (§ 366.26, subd. (c)(1).) The statute requires "clear and convincing evidence of the likelihood that adoption will be realized within a reasonable time." (*In re Zeth S.* (2003) 31 Cal.4th 396, 406.)

In determining adoptability, the juvenile court assesses the child's age, physical condition and emotional state and how these characteristics affect a prospective parent's willingness to adopt the child. (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649 (*Sarah M.*).) "To be considered adoptable, a [child] need not be in a prospective adoptive home and there need not be a prospective adoptive parent '"waiting in the wings."' [Citation.] Nevertheless, 'the fact that a prospective adoptive parent has expressed interest in adopting the [child] is evidence that the [child's] age, physical condition, mental state,

7

and other matters relating to the child are not likely to dissuade individuals from adopting the minor.  In other words, a prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent *or by some other family*.'"  (*In re R.C.* (2008) 169 Cal.App.4th 486, 491 (*R.C.*).)

In assessing adoptability, courts have divided children into two categories: those who are "generally adoptable" and those who are "specifically adoptable."  A child is "generally adoptable" if the child's traits, e.g., age, physical condition, mental state and other relevant factors do not make it difficult to find an adoptive parent.  A child is "specifically adoptable" if the child is adoptable only because of a specific caregiver's willingness to adopt.  (*R.C.*, *supra*, 169 Cal.App.4th at pp. 492-494.)  "'When a child is deemed adoptable *only* because a particular caregiver is willing to adopt, the analysis shifts from evaluating the characteristics of the child to whether there is any legal impediment to the prospective adoptive parent's adoption and whether he or she is able to meet the needs of the child.'"  (*Id*. at p. 494.)

On appeal, we review the juvenile court's finding that a child is adoptable for substantial evidence.  (*R.C.*, supra, 169 Cal.App.4th at pp. 486, 491.)  "[O]ur task is to determine whether there is substantial evidence from which a reasonable trier of fact could find, by clear and convincing evidence, that the minor is adoptable.  [Citation.] The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the finding or order."  (*Id*. at p. 491.)

As a preliminary matter, we address the terms "generally" and "specifically" adoptable.  In our view, the argument whether a child is "generally" or "specifically" adoptable obfuscates the adoptability issue before the juvenile court.  Indeed, these terms are not used in section 366.26, the statute governing termination of parental rights. Further, the juvenile court is not required to assess the general and specific adoptability of a child or make findings as to whether a child is generally or specifically adoptable.

8

Section 366.26 merely requires the juvenile court to determine if the child is likely to be adopted within a reasonable time. In other words, it requires the juvenile court to determine if the child is adoptable.

In this case, the agency's adoption assessment identified the foster parents as the prospective adoptive parents and opined that the children were adoptable based on their characteristics *and* the prospective adoptive parents' willingness to adopt them. Father did not contest the issue of adoptability, including whether the children were specifically adoptable, whether the foster mother qualified as prospective adoptive parent or whether she might have a legal impediment to adoption.

We conclude the issue of whether the foster mother qualified as a prospective adoptive parent is irrelevant to the issue of the children's adoptability. As we stated above, the presence of a prospective adoptive parent willing to adopt is an indicator of adoptability but a child does not have to be in a prospective adoptive home to be found adoptable. Further, on this evidence, the foster mother and father qualified as prospective adoptive parents. The children had been in their care for over a year and the foster parents expressed their commitment to adopting them. The fact that the foster parents had not completed a home study is unimportant at that stage because there is no requirement that a home study be completed before the juvenile court finds a child is adoptable and terminates parental rights. (*In re Marina S.* (2005) 132 Cal.App.4th 158, 166.) Further, "steps to facilitate the adoption process" include being designated by the agency as the adoptive family. (§ 366.26, subd. (n)(2)(C).) In its adoption assessment, the agency designated the foster parents as such.

We further conclude father forfeited the issue of whether the foster mother had a legal impediment to adoption. A legal impediment to adoption is relevant where a social worker's opinion that a child is likely to be adopted is "based solely" on the existence of a prospective adoptive parent who is willing to adopt the minor. (*Sarah M.*, *supra*, 22 Cal.App.4th at p. 1650.) The legal impediments to adoption are codified in Family Code

9

sections 8601 through 8603. The one father speculates may pertain is found in section 8603, which prohibits a married person who is not lawfully separated from the person's spouse from adopting a child without the consent of the spouse. Father asserts that the foster mother may be precluded from adopting the children if the foster father does not consent to it.

Here, the agency did not opine that the children were likely to be adopted "based solely" on the willingness of their prospective adoptive parents' willingness to adopt them. Rather, the agency opined there were other families willing to adopt. Indeed, according to the record, the children's grandparents expressed an interest in assuming custody of the children and maintained a positive relationship with them.

Further, we held in *G.M.* that the failure to raise the legal impediment question in the juvenile court forfeited the issue for appellate purposes. (*G.M.*, *supra*, 181 Cal.App.4th at pp. 563-564.) Here, father could have asked the social worker or the prospective adoptive mother whether she was lawfully separated or could obtain her husband's consent to an adoption. Father, however, made no such attempt at the section 366.26 hearing. Consequently, he forfeited the issue. Father nevertheless asks this court to review the issue in order to prevent an ineffective assistance of counsel claim and prevent the children from becoming legal orphans in the event the prospective adoptive parents fail to adopt. We decline to do so.

Finally, we conclude substantial evidence supports the juvenile court's finding that the children are adoptable. The children were physically healthy, were addressing their emotional trauma in therapy and enjoyed social activities. Those that were struggling academically and emotionally wanted to improve and were responsive to interventions. Additionally, they were strongly bonded to each other and wanted to be adopted by their foster parents. Equally, if not more importantly, the children were in the care of eligible and committed adoptive parents who were well aware of their struggles and the responsibility of adoption and wanted to adopt them.

To entertain the possibility that these adoptive parents may not adopt the children, as father would have us do, is mere speculation.  We prefer the more commonsensical view that "when there is a prospective adoptive home in which the child is already living, and the only indications are that, if matters continue, the child will be adopted into that home, adoptability is established.  In such a case, the literal language of the statute is satisfied, because 'it is likely' that that particular child will be adopted."  (*In re Jayson T.* (2002) 97 Cal.App.4th 75, 85.)  For all the reasons stated above, we conclude there was substantial evidence to support the juvenile court's adoptability finding.

## DISPOSITION

The order terminating father's parental rights is affirmed.