22 Cal.App.4th 1642 (1994)
28 Cal. Rptr.2d 82
In re SARAH M. et al., Persons Coming Under the Juvenile Court Law.
SACRAMENTO COUNTY DEPARTMENT OF SOCIAL SERVICES, Plaintiff and Respondent,
v.
VERONICA M. et al., Defendants and Appellants.
Docket No. C014212.
Court of Appeals of California, Third District.
March 2, 1994.
*1643 COUNSEL
Steven A. Schutte and David M. Thompson, under appointments by the Court of Appeal, for Defendants and Appellants.
L.B. Elam, County Counsel, and Loni Montgomery, Deputy County Counsel, for Plaintiff and Respondent.
[Opinion certified for partial publication.[*]]
*1644 OPINION
SCOTLAND, J.
Appellants Veronica M. (mother) and Michael M. (father) appeal from orders of the juvenile court terminating their parental rights after the court found it is likely their children, Sarah M. and Charles M., will be adopted. (Welf. & Inst. Code, §§ 366.26, 395; further section references are to the Welfare and Institutions Code.)
In the published portion of this opinion, we reject appellants' contention that the juvenile court erred in precluding them from cross-examining the social worker regarding the prospective adoptive parent's suitability to adopt the minors. In addressing this claim of error, we clarify our opinion in In re Scott M. (1993) 13 Cal. App.4th 839 [16 Cal. Rptr.2d 766], which held that questions regarding the suitability of a potential adoptive family are irrelevant to the issue whether a dependent child who has been removed from parental custody is likely to be adopted. In the unpublished parts of this opinion, we find no merit in appellants' other contentions. Accordingly, we shall affirm the orders.

FACTUAL AND PROCEDURAL BACKGROUND
The record of these dependency proceedings shows an extensive history of involvement by children's protective services with mother and father and their six children, Sarah, Charles, Jacob, Timothy, April and Matthew. That history is replete with multiple reports of neglect, as well as physical and emotional abuse, of all of the children. Only Sarah and Charles are involved in this appeal.
In September 1990, section 300 petitions were filed on behalf of five-year-old Sarah, two-year-old Charles, and their four siblings alleging the minors were at substantial risk of suffering serious physical harm because father had struck Jacob in the face, causing bruising, and mother had knowledge of the beating but failed to protect the child. (§ 300, subds. (a), (b) & (j).)
The juvenile court sustained the petitions and adjudged the minors dependent children. They were placed in foster care, and reunification services were ordered. During the reunification period, mother and father visited the minors regularly and completed a set of parenting classes. However, both parents refused to accept any responsibility for the family's difficulties, stating they "are blameless and have done nothing wrong with their children." Psychologists diagnosed each parent as suffering from an antisocial personality disorder; the prognosis for change was considered poor.
*1645 While in foster care placement, all of the children except Charles, who was still a baby, told authorities about a history of abuse allegedly perpetrated by appellants. According to the children, in July 1990 father strangled Timothy until he became unconscious. Four of the children stated father used handcuffs to restrict Timothy and Jacob at various times. The children also reported blows to the head inflicted by mother and father, and claimed Charles was thrown across the room and into a wall. The children said mother and father beat them on "an almost daily basis" and deprived them of food "for days at a time."
In January 1992, the oldest child, April, told authorities that father had sexually molested her since she was five years old. She also reported that father had sexually molested Jacob and Timothy. April stated she had decided to disclose the abuse because father may have begun molesting Charles as well. Charles told a social worker he did not want to visit father because father stuck his penis in Charles's mouth. Matthew later reported that mother had sexually abused Timothy. Jacob, Timothy, and Sarah denied they had been molested. The juvenile court sustained sexual abuse allegations contained in supplemental petitions filed on behalf of April, Matthew and Charles.
In February 1992, the juvenile court found that returning Sarah and Charles to parental custody would be detrimental to the minors, determined there was no substantial probability the minors would be returned to parental custody within six months, terminated reunification services, ordered a permanent plan of adoption for the minors, and scheduled a section 366.26 hearing.
The social worker's report prepared for the section 366.26 hearing states that Sarah (then seven years old) and Charles (then three years old) are in excellent health. "Both children are exhibiting good physical growth and their physicians have found them to be both well-developed and medically sound." Sarah shows "no signs of developmental delay." Her vocabulary is "at age level," and she has received speech therapy to correct problems with articulation due to an anatomical restraint ("anchored tongue") on her ability to produce certain sounds. Sarah recently had completed the second grade "where she made excellent social and academic progress," receiving "`satisfactory,' `good' and `outstanding' grades in all academic areas (letter grades are not given in second grade)." In a standardized intelligence examination, she scored average or above average in all test areas. "Sarah is succeeding socially as well. She interacts well with fellow students and is perceived as being a cooperative, conscientious student." The report describes Sarah as "a fairly compliant, cooperative child who is presenting no *1646 significant behavior problems in the home. While she can be stubborn and oppositional at times, she does not engage in outgoing acting out behavior and is generally considered an exceptionally easy child to parent." The foster mother reported that Sarah had engaged in instances of "sexualized behavior" approximately 18 months prior to the social worker's report, but that the incidents "have been few and have been easily controlled with increased supervision and limit setting." Sarah was receiving therapy on a weekly basis dealing with "issues of loss and self image." The therapist reported "positive implications for [Sarah's] future therapeutic progress." According to the social worker's report, Sarah "shares a close and loving relationship with her [foster mother] and appears to have easily accepted the parent/child bond which exists between them.... While Sarah is somewhat shy with people she does not know well, her reactions are well within the normal range for a child her age." The social worker's report notes that Charles is "on target in all developmental areas with the exception of expressive speech, in which he is significantly delayed." However, he is enrolled in a Headstart Program in which he "has evidenced tremendous improvement in his speech and language skills." Charles's "only continuing problem appears to be in the area of articulation and with speech therapy he is beginning to close the gaps that still exist. In all other areas, [his] development is age appropriate and there is no indication that he is experiencing any cognitive or neurological difficulties at this time." At preschool he is "making satisfactory social and academic progress" and it is "anticipated that he will be ready for entry into kindergarten in the fall of 1993." Although Charles initially had problems interacting with other students, particularly aggressiveness which intensified following visits with appellants, in recent months his "social interactions have improved to such an extent that the earlier aggressiveness is no longer a reportable problem." Despite his inarticulate speech, "Charles is already showing signs of an inquisitive mind." His memory and observation skills are "exceptional," and "it is believed he will be capable of high academic achievement." Charles initially engaged in behavior problems ("aggressiveness, limit setting, and oppositional behavior") in his foster home, however, his conduct "has stabilized considerably." He is receiving therapy on a weekly basis. His therapist reports that Charles "is the least psychologically damaged of all the children" and states that Charles's "potential for emotional health is very good." The social worker indicated that Charles has "demonstrated good growth in interpersonal relationships" and has made an excellent adjustment in his foster home. "He appears to have benefitted from the love and nurturing he has received" and "there is every belief that he has retained the ability to form close attachments with the significant people in his life."
The social worker concluded that both Sarah and Charles are adoptable. Sarah's foster mother desired to adopt her, and the social worker planned to *1647 place Charles with Sarah's foster mother who "feels great affection towards Charles and is prepared to make the same commitment to him that she has made to Sarah." Although the social worker "anticipated that this plan will be realized," she stated that, should the placement of Charles with Sarah's foster mother "fail to materialize," the social worker had "every confidence that another home will be found for Charles. He is an extremely adoptable child and there is every reason to believe that families will be available to him."
Sarah's foster mother was raising eight other children (her four biological children and four foster children). According to the social worker, the foster mother was able to meet the financial needs of all of the children in her home. "She functions very effectively as a single parent and has a good support system comprised of friends who are available to assist in handling the logistical complexities of raising a large family. Despite the large number of children in the home, the family operates smoothly. All of the children play a role in the day to day responsibilities of maintaining the household which has enabled the [foster] mother to concentrate on meeting the physical and emotional needs of the children in her care." The social worker reported the foster mother was aware of the minors' backgrounds and understood the issues involved in raising children with special needs.
April also was living in Sarah's foster home, and the foster mother wanted the children to maintain their relationships with each other. The social worker noted that "[e]very professional involved in the children's case has emphasized the need to maintain the relationship between the siblings and the children's respective caretakers are supportive of that plan."
At the section 366.26 hearing, adoptions social worker Terry Kessler (the author of the social worker report which was received in evidence by the court) testified the minors were adoptable. Kessler told the court that, if Charles was not placed with Sarah and April, Kessler would seek an adoptive home where sibling contact would be accorded "extreme importance." The foster mother testified she loved Sarah and Charles and wanted to adopt both of them. Neither the minors nor their siblings testified. However, the attorney representing Sarah and Charles told the court that the minors had no desire to visit with appellants. According to the minors' attorney, Sarah is "extremely happy where she is [with the foster mother]," and Charles "likes [Sarah's foster mother] a lot" and "enjoys his time with the [foster mother and her family]."
*1648 The juvenile court found by clear and convincing evidence that the minors were adoptable.[1] The court indicated it had considered the wishes of the minors. Appellants' parental rights were terminated, and these appeals followed.

DISCUSSION

I
Section 366.26, which sets forth the procedure for permanently terminating parental rights with regard to a minor who has been removed from parental custody and was declared a dependent child of the juvenile court on or after January 1, 1989, provides in pertinent part: "The court shall terminate parental rights only if it determines by clear and convincing evidence that it is likely that the minor will be adopted." (§ 366.26, subd. (c)(1).)[2]
At the section 366.26 hearing on the proposed termination of appellants' parental rights, the juvenile court received in evidence the social worker's report which stated the minors are likely to be adopted. In support of her opinion, the social worker detailed the minors' young ages and their good physical and emotional health, progress in therapy, intellectual and academic growth, and ability to develop interpersonal relationships. In addition, the social worker noted that Sarah's foster mother wanted to adopt Sarah, had "initiated the agency's adoption homestudy process, and there is every expectation that she will be approved to adopt Sarah." The social worker also reported that Sarah's foster mother "is prepared to make the same commitment to [Charles] ... It is anticipated that this plan will be realized, however, should the placement fail to materialize [the social worker] has every confidence that another home will be found for Charles. He is an extremely adoptable child and there is every reason to believe that families will be available to him."
Testifying at the section 366.26 hearing, the social worker reiterated her opinion that the minors are likely to be adopted. During cross-examination, the juvenile court sustained objections to a number of questions posed by appellants' attorneys. When the social worker was asked if Sarah's foster mother had used the minors' sister, April, as a babysitter for the minors, a *1649 relevance objection was sustained. When counsel asked if the social worker was "aware of any cases where children were removed from homes because there were ten children in the home," an objection on the grounds of relevance and vagueness was sustained. After the social worker testified that the training received by Sarah's foster mother as a certified foster parent included dealing with problems relating to sexually abused children, counsel inquired "how long" this training was given. A relevance objection was sustained. When counsel asked the social worker if she was aware of reports that April had sexually fondled Sarah, the court "preclude[d] further questioning in this area pursuant to [Evidence Code section] 352." The court then sustained a relevance objection to counsel's question whether the social worker was aware of an incident in which April had been drinking alcohol in the foster mother's home.
(1a) As they did in the juvenile court, appellants claim the aforesaid questions were relevant to the issue whether the minors are likely to be adopted. Appellants believe it is doubtful that the proposed adoptive parent, Sarah's foster mother, will be approved to adopt the minors once the agency's assessment is completed (see Fam. Code, §§ 8704, subd. (b), 8715, 8720) because she is a single parent who already has eight children in her home and has limited financial resources. Therefore, appellants contend that inquiry into the foster mother's suitability to parent the minors was relevant to the question whether her adoption of them will be approved by the agency, and that this question, in turn, was relevant to the issue of the minor's adoptability. This is so, they argue, because the social worker's opinion that the minors are likely to be adopted was based in part on her anticipation that Sarah's foster mother will be approved to adopt them. We are unpersuaded.
The issue of adoptability posed in a section 366.26 hearing focuses on the minor, e.g., whether the minor's age, physical condition, and emotional state make it difficult to find a person willing to adopt the minor. (See, e.g., In re Cory M. (1992) 2 Cal. App.4th 935, 951 [3 Cal. Rptr.2d 627]; In re Jennilee T. (1992) 3 Cal. App.4th 212, 224-225 [4 Cal. Rptr.2d 101].) Hence, it is not necessary that the minor already be in a potential adoptive home or that there be a proposed adoptive parent "waiting in the wings." (Jennilee T., supra, 3 Cal. App.4th at p. 223, fn. 11; In re Amelia S. (1991) 229 Cal. App.3d 1060, 1065 [280 Cal. Rptr. 503]; see In re Laura F. (1983) 33 Cal.3d 826, 838 [191 Cal. Rptr. 464, 662 P.2d 922].)
Usually, the fact that a prospective adoptive parent has expressed interest in adopting the minor is evidence that the minor's age, physical condition, mental state, and other matters relating to the child are not likely to dissuade *1650 individuals from adopting the minor. In other words, a prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent or by some other family. (See In re Scott M., supra, 13 Cal. App.4th at p. 844.)
Since the issue whether a dependent child is likely to be adopted focuses on the child rather than on the prospective adoptive family, we held in Scott M. that a parent whose right to care and custody of the child is at stake in a section 366.26 hearing may not inquire about the "suitability" of a potential adoptive family because the family's suitability to adopt is irrelevant to the issue whether the minors are likely to be adopted. (13 Cal. App.4th at p. 844.) "General suitability to adopt is a subjective matter which does not constitute a legal impediment to adoption. If inquiry into the suitability of prospective adoptive parents were permitted in section 366.26 hearings, we envision that many hearings would degenerate into subjective attacks on all prospective adoptive families in efforts to avoid termination of parental rights. Such a result is not envisioned by the statutory scheme." (Ibid.)[3]
(2) We recognize that in some cases a minor who ordinarily might be considered unadoptable due to age, poor physical health, physical disability, or emotional instability is nonetheless likely to be adopted because a prospective adoptive family has been identified as willing to adopt the child. Where the social worker opines that the minor is likely to be adopted based solely on the existence of a prospective adoptive parent who is willing to adopt the minor, an inquiry may be made into whether there is any legal impediment to adoption by that parent (Fam. Code, § 8601 [a prospective adoptive parent must be at least 10 years older than the child, unless the adoption is by a stepparent, sister, brother, aunt, uncle, or first cousin and the court is satisfied that adoption by the parent and, if married, by the parent's spouse is in the best interests of the parties and is in the public interest regardless of the ages of the child and the prospective adoptive parent], § 8602 [consent of a child over the age of 12 is necessary to the child's adoption], § 8603 [a married person, not lawfully separated, may not adopt a child without the consent of the spouse, provided the spouse is capable of giving consent]). In such cases, the existence of one of these legal impediments to adoption is relevant because the legal impediment would preclude the very basis upon which the social worker formed the opinion that the minor is likely to be adopted. (See In re Scott M., supra, 13 Cal. App.4th at p. 844.)
*1651 (1b) However, here the social worker's opinion that Sarah and Charles are likely to be adopted was not based solely on the foster mother's desire to adopt the minors. In fact, as we have noted, the availability of Sarah's foster mother as a prospective adoptive parent was not a factor in the social worker's conclusion that Charles was likely to be adopted. Rather, her opinion regarding the adoptability of Sarah and Charles was based primarily upon the minors' young ages and their good physical and emotional health, progress in therapy, intellectual and academic growth, and ability to develop interpersonal relationships. It is these attributes which indicate Sarah and Charles are adoptable. The willingness of Sarah's foster mother to adopt them supports the determination that the minors are likely to be adopted within a reasonable time, but her availability as a prospective adoptive parent is not essential to that conclusion.
Accordingly, the juvenile court did not err in sustaining objections to cross-examination regarding whether the social worker was aware of an occasion in which April had been drinking alcohol in the foster mother's home, whether the social worker knew of reports that April had sexually fondled Sarah, whether the foster mother had used April as a babysitter for the minors, how long the foster mother had received training regarding sexually abused children, and whether the social worker knew of cases in which children were removed from foster homes because there were 10 children in the residence. These questions sought to explore the foster mother's suitability to adopt the minors. As we have explained, where evidence of a minor's adoptability is not based solely on the existence of a prospective adoptive parent who is willing to adopt the child, the potential adoptive parent's suitability to adopt is irrelevant to the issue whether the minor is likely to be adopted. Such was the case here.

II-IV[*]
.... .... .... .... .... .... .... .

DISPOSITION
The orders are affirmed.
Puglia, P.J., and Sims, J., concurred.
NOTES
[*] Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II through IV.
[1] April, Matthew, Timothy and Jacob were ordered into long-term foster care.
[2] If the court determines it is likely the minor will be adopted, certain prior findings by the court (e.g., that returning the minor to the physical custody of the parent would create a substantial risk of detriment to the physical or emotional well-being of the minor) shall constitute a sufficient basis for the termination of parental rights unless the court finds that termination would be detrimental to the minor due to circumstances specified in section 366.26, subdivision (c)(1).
[3] In Scott M., we upheld the juvenile court's refusal to allow the minor's parent to question the "suitability" of the prospective adoptive family by asking whether the prospective adoptive mother would be out of the home for extended periods of time taking college classes, whether some other adult would be available to care for the children, whether the prospective adoptive family would receive financial assistance to care for the children, and whether the family had the ability to care for the minors. (13 Cal. App.4th at p. 844.)
[*] See footnote, ante, page 1642.