Filed 9/10/14  In re L.R. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re L.R. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN FRANCISCO HUMAN SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>L.R. et al.,<br><br>        Defendants and Appellants. | A140697<br><br>(San Francisco County Super. Ct. Nos. JD123113, JD123113A, & JD123113B) |

**INTRODUCTION**

The juvenile court terminated the parental rights of Lisa R. (Mother) and Anthony R. (Father)[1] with respect to their three children.  (Welf. & Inst. Code, § 366.26, (section 366.26).)[2]  Both Parents appeal, arguing that the order terminating parental rights must be reversed because (1) their son A.R. is not adoptable; (2) the sibling-relationship exception to adoption applies; and (3) the court erred in failing to place A.R. with a family relative.  We affirm.

---

[1] Mother and Father are hereafter collectively referred to as "Parents."

[2] Unless otherwise indicated, all further statutory references are to the Welfare and Institutions Code.

# FACTUAL AND PROCEDURAL BACKGROUND

The portion of the following facts in quotations is taken from our October 10, 2013 opinion in which we denied, on the merits, Mother's writ petition challenging the termination of reunification services and the setting of a section 366.26 hearing:

"Lisa R. (Mother) is the mother of five children. Her three youngest children L.R., A.R., and M.R., ages [six], [five], and [three],[3] respectively, are the offspring from her relationship with Anthony R., Sr. (Father).  L.R. and her two older half-siblings R.D. and K.D., were removed from their parents' care in February 2009.  L.R. was returned home in May 2010, and the dependencies as to the two older children were dismissed in November 2011, even though the parents did not complete a parenting education program, family therapy, or couples counseling.  After the children were returned, 'family members continued to express concerns that the children were being physically [and] emotionally abused and neglected.'

"On April 17, 2012, a second dependency petition as to Mother's three youngest children was filed alleging that she had failed to protect them from domestic violence perpetrated by Father.  ([§ 300, subds. (b), (g), & (j).])  Mother had reported to the police that Father stole her gun with ammunition and threatened to kill her and her children if she called the police.  Mother initially consented to a safety plan in which she agreed, among other things, to obtain a restraining order against Father.  Rather than comply with the plan, she took the children and joined Father when he was released from jail, and remained with him until he was arrested again a few days later. Her three youngest children were then placed in foster care.

"At the jurisdiction hearing held on June 6, 2012, the juvenile court sustained the petition as amended.  The jurisdiction report filed by the San Francisco Human Services Agency (Agency) concluded that Mother 'has physically and emotionally abused [her

---

[3] Reflects children's ages as of the date of this opinion.

children] and allowed her partner to abuse [them] for years.' Noting the family had already been provided with services in connection with the 2009 dependency proceeding, the Agency reluctantly recommended services for Mother with respect to the three youngest children, but 'only because a permanent plan cannot be made for those children until [Father] receives the six months of services to which he is legally entitled.' While not optimistic about the prognosis for the family, the Agency did acknowledge that Mother had recently engaged in services since the children were detained. Reunification services were ordered for Mother.

"At the contested six-month status review hearing held on June 7, 2013, the Agency reported that Mother was not benefitting from the services provided to her in an effort to reunify with her three youngest children. While she had participated well in her visits with her children, she reportedly evidenced 'no insight into how her behaviors and the behavior of the men in her life has negatively impacted her children.' She also presented with 'extensive mental health issues,' including 'a pattern of denying and minimizing trauma.' L.R. and A.R. exhibited problems commonly associated with abuse and exposure to domestic violence. Their therapist did not believe family therapy would be appropriate as both parents were in denial as to the abuse the children had suffered. Mother had undergone a comprehensive psychological evaluation, and while she had obtained some counseling on her own, she had not engaged in it consistently and did not appear to want to work with a skilled clinic therapist. The doctor who performed the psychological evaluation diagnosed her as having a personality disorder, characterizing her level of denial as 'catastrophic.' Mother was also reluctant to complete any further parenting classes.

"On June 14, 2013, the juvenile court issued its order terminating Mother's reunification services and scheduling a permanency planning hearing pursuant to section 366.26. The court recognized that Mother had participated in her treatment plan. However, the court concluded she had not made substantive progress in incorporating

3

services in such a way that she could protect her children. The court also found there was not a substantial probability of return of the children to Mother in the next six months." (*In re L.R., et al.* (Oct. 10, 2013, A139106) [nonpub. opn.], fns. omitted.)

On October 2, 2013, the Agency filed a section 366.26 report proposing termination of parental rights and adoption as the permanent plan.

On October 10, 2013, we denied Mother's petition for an extraordinary writ challenging the setting of the section 366.26 hearing.

The Agency's report prepared in anticipation of the section 366.26 hearing stated that all three children were physically healthy and appeared to be developmentally on target. M.R. was a sweet child who seemed overly attached to his foster father. L.R. showed clinical signs of having post-traumatic stress syndrome (PTSD), reportedly experiencing flashbacks of Parents' fighting. She would become very upset when A.R. had a violent tantrum. A.R. was diagnosed as having PTSD and was experiencing tantrums on a regular basis, sometimes five times a day, each lasting for thirty minutes. He was attending a special preschool for young children who have severe emotional problems. He was also being evaluated by a psychiatrist for medications.

The Agency's social worker, Jennifer Curley, recommended a permanent plan of adoption for all three children. However, while L.R. and M.R. appeared appropriately bonded to the caretakers and to the other children in their foster home, A.R.'s problems were a concern. The foster family was receiving respite care in order to have a break from his frequent tantrums. While they were "dedicated" to A.R., they also believed his destructive behaviors, which included pulling his siblings' hair out of their heads, as well as hitting, kicking, biting, and punching them, were very hard on the entire family. Nevertheless, they wanted to adopt him if he could be managed in the home. Curley noted A.R. was a troubled child who might need residential treatment in the future.

In an addendum report filed on October 30, 2013, the Agency reported it had contacted and evaluated several relatives for placement, including Alicia K., a paternal

4

cousin. She had indicated previously that she wanted the children, but the Agency ruled her out due to unspecified "safety concerns." The report also indicated that A.R. had been removed from the foster home due to his disruptive behavior and had been placed in a respite home on October 4, 2013. He was approved for therapeutic behavioral services and an intensive therapeutic foster home, and was to remain in respite care until an adoptive home could be identified. Notably, his tantrums had subsided since he was placed in respite care and he was doing well at school. He indicated that he liked his new home but missed his sister. His therapist reported that A.R. was able to self-regulate and calm himself down. The report recommended parental rights be terminated because A.R. was an adoptable child with several families interested in adopting him.

The section 366.26 hearing was held on December 20, 2013. Mother was present at the hearing. Father was present, but not for the entire proceeding.

Curley testified that a target adoptive home had been found for A.R. The family had been visiting him regularly for about a month and he was soon to move into their home. She believed this home would be more suitable for his special needs than his former foster home. She also reported that he and his siblings, including the two older half-siblings, had supervised visits together every two weeks. A.R.'s prospective adoptive parents were in agreement with maintaining the sibling relationships. While the initial goal had been to keep the three younger children together, once A.R.'s behavior started to deteriorate the situation became very difficult for L.R. Curley stated that A.R. does better in a home where he gets all of the attention.

At the time of the hearing, Curley no longer believed A.R. required a therapeutic placement because he was receiving a "tremendous amount of services." Since moving to the respite home, he was no longer having tantrums and was doing well at school. His therapists would continue to work closely with the new family on how to address his specific needs.

Social worker Patricia Flynn testified that she had spoken with Alicia K. on May 16, 2012 about placement. During the conversation, Flynn questioned her about a report from another relative that during a family party she had asked R.D., the three children's older half-sister, to punch another child.[4] Her answers were "a little troubling" and, as they continued to talk, she expressed ambivalence about placement. She did not request placement, but said she might want to visit the children and possibly be available for placement in the future. However, she did not contact the Agency again.

At the conclusion of the hearing, the juvenile court followed the Agency's recommendation to terminate parental rights. The court found there was clear and convincing evidence that all three children would likely be adopted.

On December 24, 2013, the juvenile court filed its order terminating Mother's and Father's parental rights. Both Parents have appealed from the order.

## DISCUSSION

### I. Whether A.R. was Adoptable

Parents claim the juvenile court erred in determining that A.R. was generally adoptable. They assert he was not adoptable due to the extreme nature of his emotional and behavioral issues. We conclude substantial evidence supported the court's adoptability finding.[5]

Termination of parental rights is authorized only if the court finds the children are adoptable. (§ 366.26, subd. (c)(1).) However, "[a]lthough a finding of adoptability must be supported by clear and convincing evidence, it is nevertheless a low threshold: The

---

[4] Alicia K. testified that she had never directed R.D. to hit another child.

[5] The Agency requests that we consider as additional evidence a status review report prepared by the adoption social worker assigned to A.R.'s case. Because these documents are not necessary to resolve the issues the parties raise on appeal, we deny the motion to take additional evidence. (*In re Zeth S.* (2003) 31 Cal.4th 396, 405.) We note, as our Supreme Court reiterated, " 'an appeal reviews the correctness of a judgment as of the time of its rendition, upon a record of matters which were before the trial court for its consideration.' [Citation.]" (*Ibid.*)

6

court must merely determine that it is 'likely' that the child will be adopted within a reasonable time. [Citations.] We review that finding only to determine whether there is evidence, contested or uncontested, from which a reasonable court could reach that conclusion. It is irrelevant that there may be evidence which would support a contrary conclusion. [Citation.]" (*In re K.B.* (2009) 173 Cal.App.4th 1275, 1292; see also *In re Gregory A.* (2005) 126 Cal.App.4th 1554, 1561-1562 ["We give the court's finding of adoptability the benefit of every reasonable inference and resolve any evidentiary conflicts in favor of affirming"].)

In addition to A.R.'s severe emotional and behavioral problems, Parents point to his bond with his siblings as a basis for challenging the adoption finding. They also emphasize that he had spent a limited amount of time with his new prospective family. As to his emotional and behavioral problems, they note at the time of the hearing to terminate parental rights, A.R. had been removed from his foster home due to his destructive behavior and excessive tantrums and had been placed in a respite home. He was diagnosed with PTSD, was receiving psychotherapy, and was taking psychiatric medications. He was also enrolled in a specialized nursery for children with severe emotional problems.

The issue of adoptability turns on whether the child's age, physical condition, and emotional state make it difficult to find the child an adoptive home. (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649 (*Sarah M.*).) "Hence, it is not necessary that the minor already be in a potential adoptive home or that there be a proposed adoptive parent 'waiting in the wings.' [Citations.]" (*Ibid.*) Nonetheless, "[u]sually, the fact that a prospective adoptive parent has expressed interest in adopting the minor is evidence that the minor's age, physical condition, mental state, and other matters relating to the child are not likely to dissuade individuals from adopting the minor. In other words, a prospective adoptive parent's willingness to adopt generally indicates the minor is likely

to be adopted within a reasonable time either by the prospective adoptive parent or by some other family. [Citation.]" (*Id.* at pp. 1649-1650, italics omitted.)

Here, the Agency had secured a prospective adoptive home for A.R. by the time of the termination hearing. The family already had several visits with A.R., including an overnight visit. Based on this evidence, the juvenile court was entitled to find that the prospective adoptive family was seriously interested in adoption. Additionally, the Agency's report indicated A.R. was in good physical health and developmentally on target. While he clearly suffered serious emotional and behavioral issues, it appeared he was coping better in his respite home and benefiting from the extra attention that he was able to receive there. He was also receiving ongoing mental health treatment and medication to help manage his behavior. These factors constitute substantial evidence A.R. was adoptable and was likely to be adopted in a reasonable time. (See *In re Lukas B.* (2000) 79 Cal.App.4th 1145, 1154.)

Contrary to Parents' contentions, this case is quite unlike *In re Amelia S.* (1991) 229 Cal.App.3d 1060, 1065, in which a hearing report indicated only that "a few foster parents were *considering* adoption." (Emphasis in original.) Here, a new prospective family had been found for A.R., and the original foster family was already committed to adopting the two other children. Even though Father complains in his separately filed brief that "we know nothing about the prospective adoptive parent(s)" of A.R., that at least two families have seriously considered adopting him constitutes substantial evidence that he is likely to be adopted within a reasonable time.

In *In re Asia L.* (2003) 107 Cal.App.4th 498, 512, on which Parents also rely, the appellate court held it was not sufficient that the foster parents had expressed willingness to "explore the option" of adopting two special-needs children. The court held that because there was no evidence "some family, if not [that] family" would be willing to adopt the children, the evidence offered failed to demonstrate a likelihood the children would be adopted. (*Id.* at p. 512.) Thus, the issue was not whether a prospective

adoptive family was available but whether the foster parents were sufficiently committed to adopting the children. That is clearly not the case here. Essentially, Parents' claim that A.R. was not generally adoptable ignores the fact that a prospective adoptive placement had been found for him. The prospective adoptive family was fully aware of his problems and had demonstrated their continued interest in adopting the child. Moreover, A.R. showed signs of improvement, further supporting the finding of adoptability. We see no valid basis for depriving A.R. of the opportunity to grow up in a permanent, stable adoptive home.

## II. *Sibling-Relationship Exception*

Parents argue substantial evidence does not support the juvenile court's finding that the sibling-relationship exception to termination of parental rights does not apply. We disagree.

The sibling-relationship exception to terminating parental rights applies when termination would substantially interfere with the child's sibling relationships and the severance of the relationships would be so detrimental to the child as to outweigh the benefits of adoption. (§ 366.26, subd. (c)(1)(B)(v); *In re L. Y. L.* (2002) 101 Cal.App.4th 942, 951-952.) The purpose of this exception is to preserve long-standing sibling relationships that serve as "anchors for dependent children whose lives are in turmoil." (*In re Erik P.* (2002) 104 Cal.App.4th 395, 404.) A parent appealing the termination of parental rights has standing to raise this exception. (*Id.* at p. 402.)

Factors to be considered in determining whether this exception applies include: (1) whether the siblings were raised in the same home; (2) whether they shared significant common experiences or have existing close and strong bonds; and (3) whether ongoing contact is in the child's best interests, including his or her long-term emotional interest, as compared to the benefit of adoption. (§ 366.26, subd. (c)(1)(B)(v).) "[T]he application of this exception will be rare, particularly when the proceedings concern young children

9

whose needs for a competent, caring and stable parent are paramount." (*In re Valerie A.* (2007) 152 Cal.App.4th 987, 1014.)

Parents argue that exceptional circumstances exist because the three children had spent their entire lives together, including the time when they lived in the first foster home. They claim A.R.'s transition to a new home would be traumatic, and that the sibling relationship "promoted their well-being to such a degree that it outweighed the well-being the children would gain in a permanent home with new and separate adoptive parents."

To the contrary, the evidence here supports the conclusion that separation actually benefits the sibling relationship rather than harms it. A.R.'s behavior towards his siblings while in the original foster home was traumatizing to L.R. and disruptive to the entire family dynamic in that home. A.R. appeared to be benefitting from being in a separate living situation from his siblings because he was receiving more personal attention. We also note that all of the prospective adoptive parents in this case had expressed commitment to maintaining visitation with all of the siblings, including the two older half-siblings. While Parents assert it was "pure speculation to suggest any future foster parents would honor the sibling relationship," it is also "pure speculation" to suggest that they will not. Regardless, there was substantial evidence to support the juvenile court's finding the benefits the children would gain from the stability and permanence of an adoptive home far outweighed the potential for detriment to the sibling relationship.

### III. Relative Placement

Parents assert the juvenile court erred in failing to evaluate and place A.R. with Alicia K. under the relative placement preference requirements. We disagree.

It is undisputed that the children have never resided with any of Parents' relatives at any time during this proceeding. Further, as the Agency notes, Alicia K., who reportedly is Father's cousin, is not a relative entitled to preferential consideration under

10

section 361.3, subdivision (c)(2).[6] Additionally, there was no evidence that she had made any effort to start or maintain a relationship with the children during this dependency.

As the Court of Appeal observed in *In re Angel B.* (2002) 97 Cal.App.4th 454: "When custody continues over a significant period, the child's need for continuity and stability assumes an increasingly important role. [Citation.] That need often will dictate the conclusion that maintenance of the current arrangement would be in the best interests of that child." (*Id*. at p. 464.) Even when a relative is seeking placement, "the fundamental duty of the court is to assure the best interests of the child, whose bond with a foster parent may require that placement with a relative be rejected." (*In re Stephanie M*. (1994) 7 Cal.4th 295, 321.) We conclude the juvenile court did not abuse its discretion with respect to relative placement.

Parents also claim they were deprived of their due process right to a meaningful hearing when the juvenile court denied them the opportunity to cross-examine the social worker as to her reasons for rejecting Alicia K. as a potential adoptive parent. Even were we to find error in the procedure, we would find it harmless beyond a reasonable doubt. (See *In re Dolly D.* (1995) 41 Cal.App.4th 440, 446-447.) We have no doubt the trial court would have made the same placement decision in any event. By the time of the termination hearing, A.R. had already begun transitioning to his own future adoptive home. He had not had any meaningful contact with any extended family members for some time. Nor had Alicia K. made any effort to become involved in his life after he was removed from Parents' custody. Under these circumstances, the children's best interests would be better served by maintaining their current placements.

---

[6] Section 361.3, subdivision (c)(2) provides, in part: " 'Relative' means an adult who is related to the child by blood, adoption, or affinity within the fifth degree of kinship . . . . However, only the following relatives shall be given preferential consideration for the placement of the child: an adult who is a grandparent, aunt, uncle, or sibling."

**DISPOSITION**

The orders of the juvenile court are affirmed.

_____
Dondero, J.

We concur:


_____
Margulies, Acting P.J.


_____
Banke, J.