Filed 3/29/16  In re A.T. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.T., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E064624 |
| Plaintiff and Respondent, | (Super.Ct.No. J249239) |
| v. | OPINION |
| J.T., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Annemarie G. Pace, Judge.  Affirmed.

Mitchell Keiter, under appointment by the Court of Appeal, for Defendant and Appellant.

Jean-Rene Basle, County Counsel, Adam E. Ebright, Deputy County Counsel, for Plaintiff and Respondent.

1

A juvenile court terminated the parental rights of appellant J.T. (mother) as to her daughter, A.T. (the child). On appeal, mother claims there was insufficient evidence to support the finding that the child was likely to be adopted. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

On April 22, 2013, the San Bernardino County Children and Family Services (CFS) filed a Welfare and Institutions Code[1] section 300 petition on behalf of the child, who was one month old at the time. The petition alleged that the child came within the provisions of section 300, subdivisions (b) (failure to protect) and (j) (abuse of sibling). Specifically, the petition included the allegations that mother had a substance abuse history that prevented her from properly and appropriately caring for the child, the child's alleged father (father)[2] knew or reasonably should have known that the child was at risk of neglect or harm while in mother's care due to her substance abuse issues, and a juvenile court sustained findings of severe neglect and general neglect of two of mother's other children, and mother's parental rights were terminated.

*Detention*

The social worker filed a detention report and noted that mother had a substance history and a history with CFS, and that she had failed to reunify with her four other children. After admitting to methamphetamine and marijuana use, mother agreed to give the maternal grandparents legal guardianship of her two oldest children. When she had

[1] All further statutory references will be to the Welfare and Institutions Code, unless otherwise indicated.

[2] Father is not a party to this appeal.

her third child, mother admitted that she had been using methamphetamines and marijuana during that pregnancy.  Her fourth child was born positive for methamphetamines.  Mother's parental rights were terminated as to the third and fourth children, and the current permanent plan was for adoption.  Mother gave birth to her fifth child, who is the subject of the current appeal.  The child is medically fragile.  She was born with spina bifida and underwent surgery soon after birth to have a shunt placed in her head, due to hydrocephalus.

The detention hearing was held on May 5, 2013.  The court detained the child in foster care upon release from the hospital and ordered that mother have supervised visits twice a week.

*Jurisdiction/Disposition*

The social worker filed a jurisdiction/disposition report on May 20, 2013, recommending that the child be declared a dependent of the court, and that reunification services not be offered to mother, pursuant section 361.5, subdivision (b)(10).  The social worker interviewed mother, who stated that she first started using methamphetamines when she was 11 years old.  Mother explained that she had been enrolled in several substance abuse programs but never completed any.  She said she was still currently using methamphetamines, but she was ready to "make changes in her life."

The court held a jurisdiction/disposition hearing on May 23, 2013, and mother set the matter for contest.  The court referred the matter to mediation and continued it for a contested jurisdiction/disposition hearing.  As a result of the mediation, mother submitted on the petition and the social worker changed her recommendation to have the court offer

3

her reunification services.  A contested jurisdiction/disposition hearing was held on July 15, 2013, and the court declared the child a dependent and ordered mother to participate in reunification services.

*Six-month Status Review*

The social worker filed a six-month status review report and recommended that mother's services be continued for six months.  The social worker reported that mother had consistently visited the child and had made significant progress in addressing the problems that led to the child's removal.  She had been cooperative with her case plan, although she had not completed it.  The social worker further reported that the child had been placed in a foster home since May 6, 2013.  The caregiver was a registered nurse who had specialized in the care of children with spina bifida.  She had been very efficient in meeting the child's special needs and facilitating her care by various medical professionals.  She had also been mentoring mother in the child's care.  The caregiver described the child as "easy going and easy to care for."  As long as her basic needs were met, she was a happy baby, who smiled easily and was becoming more responsive to other people.  According to the child's physical therapist, the child was an adorable eight-month-old baby who was making significant progress.  She was now able to roll independently and sit independently for up to five seconds.  She was also able to initiate coming to a standing position from sitting on a low stool.  The child was able to maintain eye contact, smiled appropriately, and could follow commands with tactile cueing.

At the six-month review hearing held on January 28, 2014, the court found that mother had made substantial progress in her case plan and continued her services.

4

*Twelve-month Status Review*

The social worker filed a 12-month status review report on June 25, 2014, and recommended that mother's services be continued. Mother continued to make excellent progress in her case plan, although she tested positive for methamphetamines on June 4, 2014. Nonetheless, the social worker recommended more services. The social worker reported that the child was a calm baby who now responded readily to others with smiles. She appeared trusting and had a bond with both her caretaker and mother.

The court held a 12-month review hearing on July 3, 2014, and followed the social worker's recommendations.

*Eighteen-month Status Review*

The social worker filed a status review report on October 21, 2014, and recommended that mother's reunification services be terminated and a section 366.26 hearing be set. The social worker reported that when mother drug tested positive on June 4, 2014, the test was administered following an extended visit with the child; thus, it appeared that she ingested the drugs while the child was in her custody. Furthermore, mother had not completed her substance abuse treatment program and her attendance had been poor. In addition, she had become very inconsistent in her visits with the child. Due to the infrequency of her visits, the child did not appear to be bonded with mother.

At a contested 18-month review hearing on January 5, 2015, the court found that mother had failed to participate regularly or make substantive progress in her case plan. It then terminated her reunification services and set a section 366.26 hearing. On May 5,

2015, the court continued the section 366.26 hearing in order to allow CFS more time to locate an adoptive family for the child.

*Section 366.26 Report and Hearing*

The social worker filed a section 366.26 report on July 29, 2015, and recommended that parental rights be terminated and that adoption be selected as the permanent plan. The social worker reported that the child was considered a medically at risk child. She had been diagnosed with: (1) "Spina Bifida s/p Myelomeningocele"; (2) hydrocephalus "s/p VP shunt,"; (3) chronic constipation; (4) diaper rash; (5) prophylaxis latex allergy; (6) development delay; (7) urinary retention; (8) vision impaired estropia; and (9) "Arnold Chiari II." The social worker further reported that CFS's public health nurse and social worker would continue to monitor the child's health status on a monthly basis.

The social worker reported that the child was placed in a home with the prospective adoptive mother (PAM) on June 14, 2015. The PAM was a registered nurse who had five children, one of whom was adopted. The PAM wanted the child to know she was loved and valued for who she was. The PAM stated that she was willing to do whatever was necessary for the child to achieve her goals. She understood the legal and financial responsibilities of adoption and was prepared to take them on. She felt equipped to meet the child's social, medical, psychological, and financial needs. When asked why she was most suited to adopt the child, the PAM said she loved taking care of kids with medical and physical disabilities, and she knew the best doctor, therapist, and service provider for children with spina bifida. The PAM was fully committed to

adopting the child. The social worker noted that there was a mutual attachment developing between the child and the PAM, and the child was beginning to recognize her as her parental figure. The social worker opined that the child was appropriate for adoption due to her age and the PAM's willingness to adopt her.

A section 366.26 hearing was held on August 31, 2015. Mother did not appear, and no evidence was presented. The court found clear and convincing evidence that the child was going to be adopted, and it terminated mother's parental rights. The court selected adoption as the permanent plan.

ANALYSIS

The Court Properly Found That the Child Was Adoptable

Mother contends that the court's finding of adoptability was not supported by sufficient evidence. We disagree.

"The juvenile court may terminate parental rights only if it determines by clear and convincing evidence that it is likely the child will be adopted within a reasonable time. [Citations.] In making this determination, the juvenile court must focus on the child, and whether the child's age, physical condition, and emotional state may make it difficult to find an adoptive family." (*In re Erik P.* (2002) 104 Cal.App.4th 395, 400 (*Erik P.*).) "Usually, the fact that a prospective adoptive parent has expressed interest in adopting the minor is evidence that the minor's age, physical condition, mental state, and other matters relating to the child are not likely to dissuade individuals from adopting the minor. In other words, a prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the

7

prospective adoptive parent *or by some other family*." (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649-1650 (*Sarah M.*).) "In reviewing the juvenile court's order, we determine whether the record contains substantial evidence from which a reasonable trier of fact could find clear and convincing evidence that [the child] was likely to be adopted within a reasonable time. [Citations.]" (*Erik P.*, *supra*, 104 Cal.App.4th at p. 400.)

Here, there was substantial evidence to support the court's finding of adoptability. The child was a two-year-old girl who was described as adorable and calm. She readily responded to others with smiles. She was also described as "easy going and easy to care for."

Moreover, by the time of the section 366.26 hearing, the child had lived with the PAM for approximately one and one-half months. The PAM was fully aware of the child's medical issues and developmental delays, and had expressed and demonstrated her dedication to the developmental, physical and emotional growth of the child. The social worker observed that the child had a regular routine at the PAM's home, which included being given her required medicine and being taken to therapy. All of the child's needs were being met by the PAM. As a result, the child was quickly growing attached to her and was beginning to recognize her as a parental figure. The PAM loved taking care of children with medical and physical disabilities and knew "the best" providers for children with spina bifida. She stated that she wanted the child to know she was loved and valued for who she was. The PAM was fully committed to adopting the child. She is not likely to be dissuaded.

8

Mother states, "It was clear from the beginning that [the child's] medical issues precluded her general adoptability." She then argues that adoptability thus "rested on PAM's willingness to adopt," and that "[t]his could have established the requisite specific adoptability . . . if CFS had provided all the information required by section 366.21, subdivision (i)." Section 366.21, subdivision (i)(1)(C) provides that, whenever a court sets a section 366.26 hearing, the agency supervising the child must prepare an assessment that includes an "evaluation of the child's medical, developmental, scholastic, mental, and emotional status." Mother further contends that "the subdivision (i)(1)(D) requirement . . . leaves the most 'substantial doubt' about [the child's] adoptability." That subdivision provides that the assessment must also include "[a] preliminary assessment of the eligibility and commitment of any identified prospective adoptive parent, including . . . the capability to meet the child's needs . . . ." Mother argues that the evidence did not show that the PAM "had the capability to meet [the child's] needs, primarily because the record does not establish that she comprehended them all."

Mother's arguments are misplaced. "The issue of adoptability posed in a section 366.26 hearing focuses on the *minor*." (*Sarah M.*, *supra*, 22 Cal.App.4th at p. 1649.) In other words, "questions concerning the 'suitability' of a prospective adoptive family are irrelevant to the issue whether the minors are likely to be adopted." (*In re Scott M.* (1993) 13 Cal.App.4th 839, 844.) "Rather, the question of a family's suitability to adopt is an issue which is reserved for the subsequent adoption proceeding." (*Ibid*.) Here, the social worker's opinion that the child was likely to be adopted was not based *solely* on the PAM's desire to adopt her, as mother suggests. The social worker opined that the

9

child was appropriate for adoption due to her young age, as well as the PAM's willingness to adopt her.

Furthermore, while there was evidence that the child had various medical conditions stemming from her spina bifida, there was nevertheless sufficient evidence to support the court's finding that she was adoptable. As the *Sarah M.* court stated: "We recognize that in some cases a minor who ordinarily might be considered unadoptable due to age, poor physical health, physical disability, or emotional instability is nonetheless likely to be adopted because a prospective adoptive family has been identified as willing to adopt the child." (*Sarah M.*, *supra*, 22 Cal.App.4th at p. 1650.) Thus, the very fact that the child had been placed with a parent who was willing to adopt her was sufficient evidence that she was adoptable. (*Ibid.* ["a prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time . . . ."].) Moreover, the PAM appeared to be fully capable of meeting the child's needs. She was a registered nurse, which meant she would be in a better position than most to understand and provide care for the child's needs. The child had been living with the PAM for several weeks, which indicates she was well aware of the child's medical conditions. She was still fully committed to adopting the child.

We conclude that the court properly found clear and convincing evidence that the child was adoptable.

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

HOLLENHORST

Acting P. J.

We concur:

McKINSTER

J.

MILLER

J.

11