Filed 3/21/22  In re K.D. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Glenn)

----

| | |
|---|---|
| In re K.D. et al., Persons Coming Under the Juvenile Court Law. | C094507 |
| GLENN COUNTY HEALTH AND HUMAN SERVICES AGENCY, | (Super. Ct. Nos. 19JP00944 & 19JP00947) |
| Plaintiff and Respondent, | |
| v. | |
| M.L. et al., | |
| Defendants and Appellants. | |

M.L. (mother) and B.D. (father), parents of the two minors, appeal from the juvenile court's order terminating parental rights and freeing the minors for adoption. (Welf. & Inst. Code, §§ 300, 366.26, 395.)[1]  The parents challenge the court's finding of adoptability.  We will affirm the juvenile court's judgment.

---

[1]  Undesignated statutory references are to the Welfare and Institutions Code.

1

Because the sole issue on appeal is adoptability of the minors, a detailed recitation of the facts and procedural history, particularly with respect to the parents' participation and progress in reunification services, is unnecessary to our resolution of this appeal.

The Glenn County Health and Human Services Agency (Agency) received a report that seven-year-old minor K.D., who was unaccompanied and nonverbal, walked into the home of an unknown family and was eating food from their refrigerator. The minor was barefoot, dirty, and in a soiled diaper that was too small for her. Mother did not report K.D. missing until two hours after law enforcement received the report. Due to mother's extensive child welfare history involving neglect of K.D., the Agency determined it was not safe to return K.D. to mother.

On June 11, 2019, the Agency filed a dependency petition on behalf of K.D. pursuant to section 300, subdivision (b), alleging K.D. was autistic and had special needs the parents were failing to meet. It was alleged K.D. went to school hungry and filthy, smelling of old urine, wearing soiled diapers, with fleas in her hair. The condition of the parents' home was reportedly bad and there were individuals known to be using illegal drugs coming and going. Father was reportedly using illegal drugs and was uncooperative when the Agency asked him to drug test.

The juvenile court ordered K.D. detained and placed out of the parents' home. The court ordered services to the parents including alcohol and drug testing, substance abuse treatment, and parenting education. The court also ordered counseling services for mother. In-person supervised visits between K.D. and parents were ordered for twice a week.

On June 18, 2019, the Agency filed a petition on behalf of K.D.'s 18-month-old sibling, Ke.D., pursuant to section 300, subdivisions (b) and (j), alleging father tested positive for methamphetamine, amphetamine, and THC, the family's living room was in disarray and without adequate room for Ke.D. to move around, and several other rooms

2

were severely cluttered with debris and trash covering the floor. When officers attempted to serve a protective custody warrant, the parents refused to reveal Ke.D.'s whereabouts. The petition also alleged abuse and neglect of Ke.D.'s sibling, K.D., as set forth in the first petition.

The juvenile court ordered Ke.D. detained and placed out of the home, services to the parents, and in-person supervised visits between Ke.D. and parents twice weekly. Ke.D. and K.D. were initially placed in different foster homes.

The minors' jurisdiction hearings were held concurrently, as were all subsequent hearings. The parents submitted on the social worker's reports and waived their rights to a contested hearing. The court found true the allegations in both petitions, adjudged both minors dependents of the juvenile court, and ordered twice-weekly supervised visits between the parents and the minors.

According to the August 2019 disposition report, K.D. was generally healthy with no noted medical concerns but was rated high on the autism spectrum, nonverbal, and not toilet trained. The minor was receiving services from Far Northern Regional Center (FNRC). She continued to demonstrate a need for special education services due to her autism and intellectual disability. She also had an individualized education program (IEP) team discussing options regarding which educational path would be in her best interest. Ke.D. was developmentally behind for his age and was referred for assessment at FNRC. However, his caregiver reported he had greatly improved in his walking skills and being able to maneuver around the house.

The Agency reported no relative had yet been identified for placement of the minors. The parents stated they did not have any family members who were able to take the minors. K.D. and Ke.D. were still placed in separate foster homes, both of which were meeting the minors' needs. The Agency was working with the foster parents to determine the most suitable placement so that both minors could be placed together.

While the parents had begun engaging in services, the Agency recommended continued out-of-home placement of the minors and services for the parents.

At the uncontested disposition hearing on August 15, 2019, the court ordered the minors removed from the parents pursuant to section 361, subdivision (c)(1), with supervised visits two times per week.

The six-month status review report stated K.D. was generally healthy. In addition to autism, K.D. was diagnosed with a sleep disorder, prepuberty, and wandering eyes. The medication she was taking for her sleep disorder was reportedly helping her sleep and she was able to fall back to sleep even when she did wake in the middle of the night. K.D. was prescribed glasses for her wandering eyes and her eyes no longer wandered in or out as they had prior to wearing them. K.D.'s prepuberty was to be assessed by a doctor in the near future. Since being in foster care, K.D. had begun to use some words and, on occasion, some whole sentences. K.D.'s potty training was improving with the help of her caregiver. The minor had not attempted to exit the home and was not considered a flight risk. She no longer got into the refrigerator or searched through the garbage looking for food. She was using utensils to feed herself and was no longer spitting out food she did not like. K.D.'s overall behavior and communication had improved "immensely" since being placed with her caregiver. She was doing very well in school with no behavioral issues.

In addition to his developmental delays, Ke.D. was diagnosed with muscle weakness. However, because the minor reportedly showed "much improvement" in his muscle development and tone since being in his foster home, the doctor decided to delay any further testing for three to four months, at which time the minor would be reevaluated. Ke.D. was receiving speech therapy, physical therapy, and occupational therapy once a week and had an interactive specialist in the caretakers' home once a week to help improve his development. His parent infant program intervention specialist worked with Ke.D. and the parents twice weekly during visitation. An evaluation

4

completed on January 7, 2020, concluded that Ke.D. was nearly two years old and had the average gross and fine motor skills of a 15-month-old; was fearful of steps, climbing, and various textures; exhibited upper and lower extremity tremors with increased or prolonged muscle exertion; stood with moderately to severely inverted calcanei; and hyperextended his knees during gait, "all of which suggest a general laxity that contributes to this little boy's gross and fine motor weakness." Ke.D.'s development reportedly improved "immensely" since he had been placed with his foster caregivers. He went from being nonverbal, unable to use utensils to feed himself, unable to follow simple instructions, and nonresponsive to his name or being told " 'no' " to walking steadily and running, saying approximately 25 words, using basic sign language, feeding himself, beginning potty training, and responding to his name and being told " 'no.' "

The minors were eventually placed together in August 2019. They did not appear to have a bond with one another and did not interact with each other or acknowledge each other when together during visits or in the same room. The Agency opined this might be due to K.D.'s autism and Ke.D.'s developmental delays and noted K.D. showed fondness for other children in the household and Ke.D. played with the older boys in the home. The current placement was meeting all of the minors' needs, and the Agency was working on ways to build on the minors' relationship and attachment to one another.

The minors' caregiver was experienced with parenting special needs children. She used sign language and familiar words to communicate and teach the minors, and she advocated for further services for them. She transported the minors to all of their visits and appointments with doctors, specialists, and service providers. The caregiver supervised the visits and was teaching and guiding the parents on many parenting skills important to parenting children with special needs. The Agency noted the minors "have grown with leaps and bounds since being in the caregiver's home." There were still no identified relatives willing or able to take placement of the minors.

The 12-month status review report filed August 10, 2020, stated the minors had been together in their current placement for one year. Their caregiver was not interested in providing permanency for the minors but was willing to support their transition to a potential adoptive home. The caregiver reported that the minors did not acknowledge each other when in the same room but, on one recent occasion, the minors briefly interacted in a playful manner. The Agency had not identified any relatives willing or able to take placement of the minors. The state adoptions specialist reported in July 2020 that "interested families are being narrowed down to match [the minors] with a permanent home should reunification services be terminated." The state adoptions specialist also reported that three potential concurrent homes had been found. The Agency recommended the court order the minors to remain in out-of-home placement, terminate services to the parents, and set the matter for a section 366.26 hearing.

The 12-month contested review hearing commenced on December 17, 2020. After considering the Agency's reports and the testimony of the social worker, mother, and father, the court found there was a substantial risk of detriment if the minors were returned to the parents' care and custody and no substantial probability of return by 18 months. The court terminated the parents' services and set the matter for a section 366.26 hearing.

In its April 2021 selection and implementation report, the Agency recommended the court find the minors adoptable and terminate parental rights, freeing the minors for adoption. The minors had been together in the same placement for approximately 19 months and were growing physically and developmentally. On March 25, 2021, the minors were moved to a potential adoptive home and were doing well and developing bonds with their new caretakers. A preliminary evaluation showed the potential adoptive parents were suitable for and committed to providing permanency for the minors.

The June 2021 status review report stated the minors remained with their caretakers, where their physical, emotional, and educational needs were being met.

6

The contested section 366.26 hearing commenced on July 1, 2021. Following testimony from the social worker, visitation supervisor, and the parents, the court found both of the minors adoptable and terminated parental rights, freeing the minors for adoption.

**DISCUSSION**

The parents contend there was insufficient evidence that the sibling set of special needs minors was either generally or specifically adoptable and the juvenile court therefore erred in finding the minors adoptable and terminating parental rights.[2]

To terminate parental rights, "the [juvenile] court must find by clear and convincing evidence that it is likely that the child will be adopted." (*In re Asia L.* (2003) 107 Cal.App.4th 498, 509; see also § 366.26, subd. (c)(1).) There must be "convincing evidence of the likelihood that adoption will take place within a reasonable time." (*In re Brian P.* (2002) 99 Cal.App.4th 616, 624.) "Although a finding of adoptability must be supported by clear and convincing evidence, it [(i.e., the determination that it is likely the child will be adopted within a reasonable time)] is nevertheless a low threshold." (*In re K.B.* (2009) 173 Cal.App.4th 1275, 1292.)

The issue of adoptability "focuses on the minor, e.g., whether the minor's age, physical condition, and emotional state make it difficult to find a person willing to adopt the minor. [Citations.] Hence, it is not necessary that the minor already be in a potential adoptive home or that there be a proposed adoptive parent 'waiting in the wings.' " (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649, italics omitted.) But, " 'the fact that a prospective adoptive parent has expressed interest in adopting the minor is evidence that the minor's age, physical condition, mental state, and other matters relating to the child are not likely to dissuade individuals from adopting the minor. In other words, a

---

[2] Because mother joins in and adopts by reference father's arguments without adding any additional facts or analysis, we will refer solely to father's opening brief on appeal.

prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent or by some other family.' " (*In re Lukas B.* (2000) 79 Cal.App.4th 1145, 1154, italics omitted; accord, *In re Sarah M.,* at pp. 1649-1650.)

We review the juvenile court's finding on this issue under the substantial evidence standard, giving it the benefit of every reasonable inference and resolving any evidentiary conflicts in favor of affirming. (*In re I.I.* (2008) 168 Cal.App.4th 857, 869.) That is, we must determine whether the record contains substantial evidence from which the court could find clear and convincing evidence that the minors were likely to be adopted within a reasonable time. (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1232.) If so, "[i]t is irrelevant that there may be evidence which would support a contrary conclusion." (*In re K.B., supra*, 173 Cal.App.4th at p. 1292.)

Father contends the court only found the minors generally adoptable despite their special needs ranging from mild to severe. He argues the minors' current caretakers had no children of their own and no experience raising children with special needs. Because a potential adopter would need to be very committed and capable of meeting the minors' special needs, the three months spent with the current caretakers was an insufficient amount of time to determine whether the minors were either generally or specifically adoptable by these caretakers. The claim lacks merit.

"The court was not required to find the children 'generally' or 'specifically' adoptable. [Citation.] It was required only to find by clear and convincing evidence that the children were 'likely' to be adopted within a reasonable time [citations] . . . ." (*In re Mary C.* (2020) 48 Cal.App.5th 793, 802, fn. omitted.) Here, the court found "by clear and convincing evidence that the [minors] are adoptable." There is sufficient evidence in the record that, while both minors had varying degrees of medical issues and developmental challenges, they were both likely to be adopted within a reasonable time.

8

When K.D. was detained, she was rated high on the autism spectrum and had intellectual disabilities, was nonverbal, and was not toilet trained. It was soon discovered she also had a sleep disorder, prepuberty, and a wandering eye. Once in foster care, she began using words and whole sentences, she began taking medication to address her sleep disorder and her prepuberty, her potty training improved, and she learned to wear prescription glasses. She also learned to use utensils to feed herself. She had not attempted to exit the home and her behavior and communication improved "immensely." While K.D. required special education services, she had an IEP team helping to assess what educational path was best for her and she was able to attend school with little or no behavioral issues. Ke.D. also had some intellectual issues, although considerably less severe than his sister's, as well as significant developmental delays and muscle weakness. He, too, improved "immensely" once placed with and assisted by his caretakers. Both minors made great strides with their first caretakers and were doing well with their current caretaker of several months.

Father claims the record does not support the finding that the minors were generally adoptable and argues the special needs of the minors and the fact that they had only been with their new caretakers for three months prohibited any finding of specific adoptability. In support of his claim, father relies on *In re B.D., supra,* 159 Cal.App.4th 1218 and *In re Carl R.* (2005) 128 Cal.App.4th 1051. Both cases are distinguishable.

B.D. was one of eight children, five of which were the subject of the appeal. The juvenile court terminated parental rights, finding B.D. and his siblings would likely be adopted within a reasonable time and adoption was the appropriate permanent plan. (*In re B.D.*, *supra,* 159 Cal.App.4th at pp. 1222, 1226.) The mother argued on appeal that the adoptability finding was not supported by sufficient evidence given that B.D. and his siblings were strongly bonded to each other, and the size of the sibling group and the minors' "emotional, developmental and behavioral problems belie a finding that they are specifically or generally adoptable." (*Id.* at p. 1230.) B.D. also appealed arguing, among

9

other things, that the proposed adoptive family had not yet been screened; thus, there was insufficient evidence that he, as a member of a bonded sibling group, would be adopted within a reasonable time. (*Id.* at pp. 1230-1231.)

The Court of Appeal instructed that "[t]he question of adoptability usually focuses on whether the child's age, physical condition and emotional health make it difficult to find a person willing to adopt that child [citation]" and, "[i]f the child is considered generally adoptable, we do not examine the suitability of the prospective adoptive home. [Citation.]" (*In re B.D., supra,* 159 Cal.App.4th at pp. 1231-1232.) The court added, "When the child is deemed adoptable based solely on a particular family's willingness to adopt the child, the trial court must determine whether there is a legal impediment to adoption." (*Id.* at p. 1232.) With regard to the one family that had expressed a specific interest in adopting B.D. and his siblings at the time of the section 366.26 hearing, the court concluded the absence of a foster care license and a preliminary assessment constituted a legal impediment to adoption. (*In re B.D.,* at pp. 1233-1234.) However, after consideration of postjudgment evidence, the court determined any error was harmless and affirmed the juvenile court's judgment. (*Id.* at pp. 1239-1241.)

Here, the court found the minors adoptable without mention of the prospective adoptive parents or of any perceived difficulty finding someone willing to adopt based on the age, physical condition, or emotional health of either minor. As previously discussed, there was sufficient evidence to support a finding of general adoptability. Even assuming the court deemed the minors adoptable based solely on the current caregivers' willingness to provide permanency, there was no evidence of any legal impediment to adoption of the kind found in *In re B.D.* On the contrary, the minors had spent approximately three months with their current caregivers, who were committed to providing permanency for the children and were providing for their physical, emotional, and educational needs. The Agency had completed its preliminary evaluation of the potential adoptive parents, who were found to be suitable to adopt the minors. They had no reported criminal or child

welfare history, they understood the legal and financial rights of adoption, and they were willing to accept the responsibilities of being adoptive parents. Further, the current caretakers reported they would keep the minors together and not interfere with the sibling relationship. The minors' previous caretaker was supportive of the current caretakers and very cooperative in helping them learn the needs of and communication support for the minors. Finally, the potential adoptive parents were demonstrating good parenting practices during preplacement visits and while transitioning the minors into their home. Based on the facts and circumstances of this case, *In re B.D.* is distinguishable.

*In re Carl R.*, *supra,* 128 Cal.App.4th 1051 is similarly distinguishable. Eight-year-old Carl R. suffered such severe disabilities that he had the emotional maturity of an infant and was required to live the majority of his life in a convalescent hospital. It was undisputed he would always require around-the-clock care. (*Id.* at p. 1058.) Here, neither of the minors required total care for the rest of their lives. The minors' intellectual, medical, and behavioral issues had improved "immensely" while in foster care. The potential adoptive parents with whom the minors had been for over three months were evaluated, found suitable to adopt, meeting the minors' needs, and willing to provide permanency.

We conclude there was sufficient evidence to support the court's finding of adoptability.

# DISPOSITION

The juvenile court's judgment is affirmed.

                                   /s/_____

                                   HOCH, J.

We concur:

/s/_____
BLEASE, Acting P. J.

/s/_____
ROBIE, J.