Filed 12/7/20  In re N.M. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Amador)

----

| | |
|---|---|
| In re N.M. et al., Persons Coming Under the Juvenile Court Law. | C091875 |
| AMADOR COUNTY DEPARTMENT OF SOCIAL SERVICES, | (Super. Ct. Nos. 19DP0721, 19DP0722, 19DP0723 ) |
| Plaintiff and Respondent, | |
| v. | |
| E.M., | |
| Defendant and Appellant. | |

E.M., mother of the minors (mother), appeals the juvenile court's order terminating her parental rights and freeing the minors for adoption.  (Welf. & Inst. Code, §§ 366.26, 395.)[1]  She claims there was insufficient evidence to support the court's

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

1

adoptability finding as to the three minors who are the subjects of this appeal. Finding no merit in mother's claim, we will affirm the juvenile court's orders.

## I. BACKGROUND

Mother and her sister, J.M., adopted four children, L., N., M., and R. (ranging in age from five to 12 at the time of removal). All four minors were prior dependents of the juvenile court after having been removed from their families of origin due to neglect and abuse. L. and M., who are biological siblings, were placed with mother in 2013. N. and R., who are biological half-siblings, were placed with mother in 2014. The adoptions of all four minors by mother and J.M. were finalized on November 20, 2015. Prior to and after the minors' adoptions, there were numerous reports to Child Protective Services (CPS) of abuse and neglect by mother.

On April 14, 2019, L. and R. ran away from home to escape mother's abuse. All four minors disclosed regular physical and emotional abuse by mother over the previous five years. J.M. confirmed the abuse by mother. J.M. explained she could not protect the minors because she worked full-time and was not home when most of the abuse occurred. She stated mother was unemployed and needed mental health care. While J.M. disagreed with mother's abuse of the minors, J.M. could not articulate a plan to keep the minors safe and could not explain how she could keep the minors away from mother. She explained that she and mother did not have a support system because they had been disowned by the rest of their family, and their friends had been "run off by the children's behaviors."

J.M. also reported to law enforcement that mother had been struggling with depression and mental health issues which had resulted in mother becoming increasingly agitated and angry with the minors. J.M. again affirmed physical abuse of the minors by mother and admitted she had witnessed mother push the minors to the ground and strike them in the face with a closed fist. J.M. also disclosed she was afraid of mother, who had

become increasingly hostile toward J.M., but she had not reported any incidents of abuse for fear of getting into trouble with law enforcement.

Mother was arrested for felony child abuse on April 14, 2019. She denied ever using physical force to discipline the minors and denied any inappropriate or derogatory comments or language toward the minors.

On April 17, 2019, the Amador County Department of Social Services (Department) filed dependency petitions on behalf of L., M., and N. pursuant to section 300, subdivisions (a), (b), and (c) and additionally subdivision (j) as to N.[2] The petitions alleged physical abuse of all four minors by mother, including punching the minors and pushing them to the ground, hitting R. with a belt, cutting L. with a piece of glass, stabbing L. with a pencil and a knife, biting L.'s finger, throwing L. against a wall, biting M.'s finger, and choking M. so hard his face turned purple. It was also alleged that J.M. witnessed the abuse but failed to protect the minors. The petitions further alleged emotional abuse of R. and L., resulting in mental health issues including anxiety, disruptive mood disorders, and mood dysregulation such that both minors were in therapy and taking psychotropic medication, and that R. had been hospitalized twice in the past five years for mental health treatment.

The court ordered the minors detained from the care of J.M. and mother. R. and L. were placed together in one foster home and M. and N. were placed together in another foster home located nearby. The court further ordered supervised visitation between J.M. and the minors, but no contact between mother and the minors.

Approximately one month later, the minors filed a petition pursuant to section 388 requesting that J.M.'s visits be reduced due to J.M. acting inappropriately, making

---

[2] It appears from the record that a petition was also filed on behalf of R. However, that petition was not made a part of this record and R. is not a subject of mother's appeal. R. will, however, be mentioned where relevant to the issues on appeal.

statements and questioning the minors in a manner that made them cry, and refusing redirection from the visitation monitor. The petition alleged J.M.'s visits were causing emotional harm to the minors, and R. and L. no longer wished to see her. The petition requested that visitation be modified until the issues could be addressed in a therapeutic setting.

On June 17, 2019, following a contested hearing on the minors' section 388 petition, the court ordered continued suspension of mother's visits and modified visits between J.M. and the respective minors.

On July 22, 2019, mother executed a waiver of rights and submitted on the Department's reports and the court sustained the allegations in the petitions. Visitation orders remained unchanged but for the temporary suspension of J.M.'s visits with M. and N.

The August 2019 disposition report recommended the court terminate mother's (and J.M.'s) reunification services pursuant to section 361.5, subdivision (b)(6) and set the matter for a section 366.26 hearing. The Department also recommended that all contact between the minors and mother (and J.M.) be terminated in order to allow the minors "to heal and move forward with permanent placement." Mother was reportedly participating in services, including an anger management program, but she blamed CPS's involvement on R.'s mental health issues and her own lack of training on how to manage those issues. J.M. refused to meet with the social worker or provide any information or insight into the family's needs. The Department concluded it was unlikely that any treatment programs or services would ensure that mother (or J.M.) would not reabuse the minors, and there was no one to protect the minors from injury or death if they were returned to mother.

None of the three oldest minors wanted to return to mother due to the prior abuse she inflicted on them. L. displayed physical signs of fear when asked about returning to mother. M. stated he did not want to return because mother "hurt him so much." R.

4

disclosed she had to lie and say she did things in order to protect her younger siblings from getting hurt, and she felt much better now that she could tell the truth. The youngest minor, N., stated he did not want to listen to the rules of the foster parents because "his momma" told him he had to listen to her rules only, which would help him get home faster. R. and L. wanted their foster parents to adopt them, and L. asked if he could call his foster mother "mom."

The Department reported it made diligent efforts to identify, locate, and contact the minors' relatives, none of whom were interested in any ongoing contact with or providing placement for the minors. R. and L. had reportedly been removed from their previous foster home, placed in an emergency foster home, and then placed in their current foster home on May 3, 2019.

On August 8, 2019, the court continued its previous order suspending visitation between the minors and mother and J.M.

J.M. was not present at the contested disposition hearing on September 24, 2019, wherein, pursuant to mother's waiver, the court terminated mother's (and J.M.'s) reunification services pursuant to section 361.5, subdivision (b)(14) and set the matter for a section 366.26 hearing. The court further ordered no visitation for mother or J.M. The court identified the four minors as a sibling group. The Department informed the court that, based on the different needs of each minor, it was not in the minors' best interests to have all four children placed together, noting R. and L. were placed together in one foster home and M. and N. were placed together in another foster home. The Department also indicated both foster homes were potential adoptive homes.

The January 2020 section 366.26 report recommended termination of parental rights with adoption as the permanent plan for all four minors. R. and L. remained together in their foster placement, where they had been since May 2019, and M. and N. remained together in their foster placement, where they had been since April 2019. All four minors were assessed and determined to be suitable for adoption individually, but

the minors requested that they remain together. The Department was exploring the availability of families willing to adopt all four children but had yet to identify any prospective adoptive parents or legal guardians for the minors. It was noted that, "[a]s a sibling group of four children they will be difficult to place due to the sheer number of children, their age range (12 years-of-age to five) and concerning behaviors exhibited by the eldest two [R. and L.]." Nonetheless, given that the minors had no desire to maintain any contact with either mother or J.M. over the past six months, the Department felt strongly that parental rights should be terminated and adoption pursued for the minors. It was noted that although the minors each continued to struggle with problematic behaviors and challenges, all four minors had made great strides in social, emotional, and physical aspects of their lives since having no contact with mother or J.M. The Department opined that it would be in the minors' best interests to be free from any attachment to mother and J.M. in order to allow the minors to "fully heal from their trauma."

The adoption assessments attached to the section 366.26 report reiterated that each minor was suitable for adoption individually, their current caretakers were unwilling to adopt, and a specific adoptive family had not yet been identified, but that the Department felt additional efforts would help to locate a suitable family.

The contested section 366.26 hearing commenced on February 27, 2020. Mother was present; J.M. was not. Mother objected to termination of parental rights but provided no evidence. The Department submitted on its reports. The court found the minors adoptable and terminated the parental rights of mother and J.M. with a permanent plan of adoption.

Mother filed a timely notice of appeal of the court's February 27, 2020 order.

Prior to filing its response brief in this appeal, the Department filed a motion to augment the clerk's transcript with an interim post-permanency update report, filed July 21, 2020, informing the court that all four minors had been placed together in a potential adoptive home, were reportedly adjusting well, and were happy about the

prospect of being adopted with their siblings. The potential adoptive parents were reportedly "very involved in the children's treatment plans and have shown a deep commitment to adoption of all four siblings together." Mother filed a response to the Department's motion stating she "has no objection to the Court augmenting the appellate record with the report and considering its content." We grant the Department's motion to augment the clerk's transcript with the July 21, 2020 report.

## II. DISCUSSION

Mother contends there was insufficient evidence to support the juvenile court's finding that the minors were likely to be adopted within a reasonable period of time. Based on that erroneous finding, she argues, the court prematurely and erroneously terminated her parental rights and should have instead continued the selection and implementation hearing for 180 days pursuant to section 366.26, subdivision (c)(3) to allow for continued adoptive recruitment efforts.

To terminate parental rights, "the [juvenile] court must find by clear and convincing evidence that it is likely that the child will be adopted." (*In re Asia L.* (2003) 107 Cal.App.4th 498, 509; see also § 366.26, subd. (c)(1).) There must be "convincing evidence of the likelihood that adoption will take place within a reasonable time." (*In re Brian P.* (2002) 99 Cal.App.4th 616, 624.) "Although a finding of adoptability must be supported by clear and convincing evidence, it [i.e., the determination that it is likely the child will be adopted within a reasonable time] is nevertheless a low threshold." (*In re K.B.* (2009) 173 Cal.App.4th 1275, 1292.)

The issue of adoptability "focuses on the minor, e.g., whether the minor's age, physical condition, and emotional state make it difficult to find a person willing to adopt the minor. [Citations.] Hence, it is not necessary that the minor already be in a potential adoptive home or that there be a proposed adoptive parent 'waiting in the wings.' " (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649, italics omitted.) But, " 'the fact that a prospective adoptive parent has expressed interest in adopting the minor is evidence that

7

the minor's age, physical condition, mental state, and other matters relating to the child are not likely to dissuade individuals from adopting the minor. In other words, a prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent or by some other family.' " (*In re Lukas B.* (2000) 79 Cal.App.4th 1145, 1154, italics omitted; accord, *In re Sarah M., supra*, at pp. 1649-1650.)

We review the juvenile court's finding on this issue under the substantial evidence standard, giving it the benefit of every reasonable inference and resolving any evidentiary conflicts in favor of affirming. (*In re I.I.* (2008) 168 Cal.App.4th 857, 869 (*I.I.*).) That is, we must determine whether the record contains substantial evidence from which the court could find clear and convincing evidence that the child was likely to be adopted within a reasonable time. (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1232 (*B.D.*).) If so, "[i]t is irrelevant that there may be evidence which would support a contrary conclusion." (*In re K.B., supra*, 173 Cal.App.4th at p. 1292.)

Here, mother does not appear to challenge the court's finding that the three minors at issue, L., M., and N., were ultimately adoptable, focusing only on the implied finding that they would be adopted within a reasonable amount of time. While she argues in passing that "the evidence did not show the children were either generally or specifically adoptable," she nonetheless concedes the minors possessed positive traits, showed significant improvement in many areas since being placed in foster care, had no medical concerns, and were developmentally on track, and that they had made significant progress socially, emotionally, and physically since contact with mother and J.M. had ceased. "A child who is happy, healthy and young, with no discernable developmental problems, can be found to be generally adoptable" even if no prospective adoptive family has been identified as ready to adopt. (*In re B.D.* (2019) 35 Cal.App.5th 803, 817.)

There was sufficient evidence to support the court's adoptability finding. According to the adoptability assessments, the minors were all suitable for adoption

8

individually. When first placed in foster care, both M. and N. had almost daily incidents of enuresis but, as of December 2019, the issue was all but resolved for both minors. L., M., and N. were developmentally on track and were doing well academically. L. attended weekly therapy which emphasized trauma-focused cognitive behavior and saw an in-home behavioral therapist weekly. He stopped all psychotropic medication in September 2019 and had reportedly made significant behavioral improvements since being placed with his foster parents. While L. still exhibited negative behaviors, including hoarding, stealing from others at school and at home, and a lack of remorse, he had reportedly made great strides in social, emotional, and physical aspects of his life since having no contact with mother or J.M. M. also attended weekly counseling and while he exhibited some negative behaviors such as being quick to anger, argumentative, competitive, and sometimes untruthful, his foster parents also described him as kind, helpful, cheerful, and social, as well as intelligent and empathetic, with a good sense of humor. N., the youngest of the three minors, also attended weekly counseling and met regularly with a behavioral specialist. N. exhibited behaviors such as crying and becoming easily upset and hugging everyone he met without having a sense of "stranger danger," as well as taking things that were not his both at home and at school. However, his foster parents described him as extroverted and empathetic, and he too had reportedly made great strides in various aspects of his life since having no contact with mother or J.M.

Mother argues the minors' continued struggle with problematic behaviors and challenges and their complicated sibling relationship made it unlikely they would be adopted within a reasonable amount of time. We are not persuaded. The adoptability assessments for the three minors concluded the children could be transitioned to an adoptive family with minimal disruption. The minors were assessed to be suitable for adoption individually but had requested placement together as a sibling set of four. While the Department had yet to identify prospective adoptive parents for the minors,

9

noting it would be difficult to place them together due to the number of children, their age range, and concerning behaviors exhibited by L. and R., the Department was committed to exploring all available options in order to identify a family willing to adopt all four children before considering other options. To that end, the Department requested a court order authorizing it to utilize all available "child specific" recruitment tools, including electronic and print media. Given the progress and stability of the minors in their respective placements, and the fact that each of the minors was generally adoptable, it was reasonable to conclude that the minors would be adopted within a reasonable time.

Further, as the Department aptly argues, mother's reliance on the fact that a prospective adoptive home had not yet been identified for the three minors, either individually or as a sibling group, is misplaced. As previously noted, "it is not necessary that the minor already be in a potential adoptive home or that there be a proposed adoptive parent 'waiting in the wings.' " (*In re Sarah M., supra,* 22 Cal.App.4th at p. 1649.)

Similarly, while it was the Department's goal to place the minors together as a sibling group, the likelihood of finding a placement *for the sibling group* was not relevant to the court's adoptability finding. "[T]he statutory scheme and case law require a determination of the adoptability of a child as an individual." (*I.I.*, *supra*, 168 Cal.App.4th at p. 872.) The *I.I.* court disagreed with *B.D., supra,* 159 Cal.App.4th 1218 "to the extent it held that a finding of adoptability in the context of a bonded sibling group requires a finding that the children are likely to be adopted *as a sibling group* within a reasonable time." (*I.I., supra,* at p. 872, fn. 3.) The Department's goal did not preclude the possibility of placement of the minors separately if a suitable opportunity arose. Given the general adoptability of each of the minors, and in the absence of any evidence that it would be detrimental to separate the minors or that any one of the minors was not suitable for adoption, it was reasonable to conclude the minors would be adopted within a reasonable time.

10

While not essential to our decision in this case, it is significant that the Department was able to identify a potential adoptive home in which to place all four of the minors in July 2020, that the potential adoptive parents were very involved in the minors' treatment plans and were deeply committed to adopting all four siblings together, and that the minors were doing well in their new placement and were excited about the possibility of remaining there as adoptees. As mother points out, as of the filing of the motion to augment, the review hearing had yet to be held and the Department's interim review report had yet to be authenticated or entered into evidence, and the potential adoptive home had yet to be approved. Nonetheless, the report is relevant if for no other reason than to demonstrate that the Department was indeed searching for a potential adoptive home for the sibling group and had successfully identified at least one potential home willing to accept all four minors.

Finally, mother argues the court was premature in terminating parental rights and should instead have proceeded according to section 366.26, subdivision (c)(3) as an appropriate alternative to address the minors' permanency planning needs and avoid the risk of legal orphanage while serving the minors' best interests. We disagree.

Section 366.26, subdivision (c)(3) provides as follows: "If the court finds that termination of parental rights would not be detrimental to the child pursuant to paragraph (1) and that the child has a probability for adoption but is difficult to place for adoption and there is no identified or available prospective adoptive parent, the court may identify adoption as the permanent placement goal and, without terminating parental rights, order that efforts be made to locate an appropriate adoptive family for the child, within the state or out of the state, within a period not to exceed 180 days. During this 180-day period, the public agency responsible for seeking adoptive parents for each child shall, to the extent possible, ask each child who is 10 years of age or older to identify any individuals, other than the child's siblings, who are important to the child, in order to identify potential adoptive parents. The public agency may ask any other child to provide that

11

information, as appropriate. During the 180-day period, the public agency shall, to the extent possible, contact other private and public adoption agencies regarding the availability of the child for adoption. During the 180-day period, the public agency shall conduct the search for adoptive parents in the same manner as prescribed for children in Sections 8708 and 8709 of the Family Code. At the expiration of this period, another hearing shall be held and the court shall proceed pursuant to paragraph (1), (2), (3), (5), or (6) of subdivision (b). For purposes of this section, a child may only be found to be difficult to place for adoption if there is no identified or available prospective adoptive parent for the child because of the child's membership in a sibling group, or the presence of a diagnosed medical, physical, or mental handicap, or the child is seven years of age or older."

To the extent mother's argument is an attempt to assert the sibling relationship exception to adoption (§ 366.26, subd. (c)(1)(B)(v)), she did not raise the exception in the juvenile court and has thus forfeited her right to do so here on appeal. (*In re Daisy D.* (2006) 144 Cal.App.4th 287, 291-292; *In re Erik P.* (2002) 104 Cal.App.4th 395, 403; *In re Christopher B.* (1996) 43 Cal.App.4th 551, 558; *In re Dakota S.* (2000) 85 Cal.App.4th 494, 501-502.) In any event, once the juvenile court found the minors adoptable and terminated parental rights, it retained jurisdiction over the minors, pursuant to section 366.3, subdivision (a)(1), which provides that "[t]he status of the child . . . shall be reviewed every six months to ensure that the adoption or legal guardianship is completed as expeditiously as possible." At that six-month hearing, the Department must prepare for the court a report describing, among other things, whether the minors have "been placed with a prospective adoptive parent or parents" and, if not, "the efforts made to identify an appropriate prospective adoptive parent or legal guardian, including, but not limited to, child-specific recruitment efforts and listing on an adoption exchange." (§ 366.3, subd. (g)(4) and (6).) The report must also include "[t]he progress of the search for an adoptive placement if one has not been identified," "[a]ny impediments to the

adoption or the adoptive placement," and "[t]he anticipated date by which the minors will be adopted or placed in an adoptive home." (§ 366.3, subd. (g)(8)-(10).) As discussed above, the interim review report filed July 21, 2020, identified a potential adoptive home in which all four minors had been placed and noted the potential adoptive parents were deeply committed to adopting all four siblings together. Any deficiencies in the report could be raised at the time of the pending post permanent plan review hearing.

The juvenile court's finding of adoptability was supported by substantial evidence.

## III.  DISPOSITION

The juvenile court's orders are affirmed.


/S/

RENNER, J.



We concur:


/S/

RAYE, P. J.


/S/

DUARTE, J.

13