Filed 12/23/22  In re D.B. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re D.B., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>J.B.,<br><br>     Defendant and Appellant. | D080653<br>consolidated with D080789<br><br><br>(Super. Ct. No. EJ4539) |

APPEAL from an order of the Superior Court of San Diego County, Gary M. Bubis, Judge.  Affirmed.

Sarah Vaona, under appointment by the Court of Appeal, for Defendant and Appellant.

Claudia G. Silva, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Dana Shoffner, Deputy County Counsel, for Plaintiff and Respondent.

INTRODUCTION

J.B. (Father) appeals a juvenile court order determining that minor D.B. was adoptable and ordering a permanent plan of adoption after terminating his parental rights. His sole contention on appeal is that there was not substantial evidence to support the finding that D.B. was adoptable because the San Diego County Health and Human Services Agency (Agency) did not conduct a new adoption assessment after the child was moved from a relative's home to an approved resource family home. We agree with the Agency that Father forfeited his right to challenge the adequacy of the Agency's assessment because he did not object to it at the time of the hearing. To the extent Father challenges the sufficiency of the adoptability finding, we conclude the court's finding was supported by substantial evidence because there was undisputed evidence that the child was generally adoptable. We, therefore, affirm the order.[1]

---

[1] Father filed a notice of appeal on July 12, 2022 (case No. D080653) regarding July 6, 2022 orders terminating his parental rights to D.B's younger siblings, J.B. and E.B. Father subsequently filed a separate notice of appeal regarding an order from August 3, 2022, terminating his parental rights as to minor D.B (case No. D080789). At Father's request we consolidated the appeals. Father's briefing in the consolidated matter did not raise a claim of error or other defect with respect to the court's orders as to J.B. and E.B. Therefore, his appeal as to these minors is dismissed as abandoned. (*In re Sade C.* (1996) 13 Cal.4th 952, 994.) And because this appeal is focused on D.B.'s adoptability, we discuss only facts regarding the siblings as necessary for context.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*Proceedings Before the Permanency Planning Hearing*

The Agency filed a petition in July 2020 on behalf of then three-year-old D.B. and her two younger siblings pursuant to Welfare and Institutions Code[2] section 300, subdivision (b), based on their ongoing exposure to serious domestic violence between Father and D.F. (Mother) and Mother's threats to harm the children.

Before the Agency filed the petition, Mother took D.B. and one sibling to temporarily stay with an aunt in another state when she felt overwhelmed and unable to care for the children. She left the other sibling with an uncle in San Diego County. The Agency had opened a voluntary case to assist Mother and alleviate the risk to the children, but Mother did not follow through with or participate in voluntary services and the parents continued to engage in domestic violence. The Agency filed the petition because it believed court oversight with a family reunification case was "the safest option" while the children were placed outside the home.

At the detention hearing, the juvenile court made a prima facie finding that D.B. was a child described by section 300, subdivision (b), and detention was necessary because there was a substantial danger to her physical health and there was no reasonable means to protect her without removal from the parents. The court took temporary jurisdiction under the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA) because the family resided in Mexico. It ordered D.B. detained out of the home, issued a pick-up order to return D.B. to California, and granted supervised visitation for the

---

2    All further undesignated statutory references are to the Welfare and Institutions Code.

parents. After returning to California, D.B. was placed with her siblings in their uncle's home in San Diego County.

Before D.B. went to stay with the out-of-state aunt, she was shy, did not speak, and appeared anxious. She would say one word over and over, "like in a panic." In the month she was placed with the aunt, D.B. began talking more and was "getting healthy, outgoing, and happy." When D.B. was placed with the uncle's family, she had some impulse control issues and would grab toys from the caregivers' child or grab the child. D.B. also cried when the caregiver mentioned going out.

By the time of the six-month review hearing in March 2021, D.B. was an active child who was doing well in daycare. She ran, walked, played, and spoke in sentences. She participated in services through Comprehensive Assessment and Stabilization Service and the caregiver anticipated starting services for mental health, speech therapy, and physical therapy through another provider.

A case worker said D.B. and her siblings were not "regulating" after visits with the parents and there were concerns from the daycare providers and the relative caregivers about the children's behaviors. The caregivers expressed concern about D.B. showing anger and aggression toward one of her siblings and the caregivers' child. However, they were willing to have her stay with them while the agency evaluated the out-of-state aunt's home for placement.

At the time of the 12-month review hearing in September 2021, D.B. and her siblings continued to live with the uncle's family. Sadly, Mother had passed away unexpectedly in May 2021. Father attended virtual visits with D.B. and her siblings, but his visits were inconsistent. Although he participated in therapy, it was also inconsistent. He did not appear to have

4

insight about parenting multiple children and blamed Mother for the violence that had occurred in the home. The Agency recommended termination of Father's services and the setting of a permanency planning hearing.

By now, D.B. was a talkative, playful, and outgoing child who knew her alphabet letters, was counting, was potty trained, and was more independent. Her teachers enjoyed having D.B. in class where she was friendly, outgoing, and a great learner. She did well with meeting new friends, but she did not like to share toys. She generally got along well with other children in the home, but could get aggressive when others received attention or had a toy she wanted. The relative caregivers were able to handle these situations and talk through the situation with D.B. to calm her down.

The relative caregivers and teachers at school observed that D.B. was often anxious before visits with Father. Teachers also noticed that D.B. was more aggressive with other children and showed signs of anxiousness after visits with Father. D.B. participated in trauma therapy and was working with a therapist regarding her behaviors and Mother's death.

At Father's request, the juvenile court set the matter for a contested 12-month review hearing in November 2021. Before the scheduled contested hearing, the Agency reported that D.B. was doing well academically. However, she continued to struggle with tantrums at school and had episodes of hitting other children. She became emotional, cried, and "shut down" when she dressed up for a scheduled virtual visit with Father and he did not call.

In November 2021, the relative caregivers gave notice they could no longer keep D.B. because her behavior was affecting their biological children. They planned to wait until the out-of-state aunt's home was approved, but set a deadline by which the child needed to leave their home. The Agency

understood from the other state agency that the aunt would receive approval. In the meantime, the juvenile court approved an extended visit for D.B. with the aunt while the other state completed the interstate compact on placement of children (ICPC) paperwork.

D.B. did well in her new placement with the out-of-state aunt even though the adjustment was difficult at first. The aunt quit her job to stay with D.B. and uncle's family stayed in touch with D.B. by calling, including to read bedtime stories to her.

After some continuances, the contested 12-month review hearing occurred in January 2022. The Agency reported that Father had no insight or accountability for the events giving rise to the Agency's involvement with the family. The juvenile court terminated reunification services for Father and set a date for a section 366.26 hearing. It ordered the Agency to prepare a permanent planning assessment pursuant to section 366.21.

## II.

*Combined Section 387 and Contested Section 366.26 Hearing*

A.      *Section 366.26 Report and Assessment*

The Agency submitted its section 366.26 report for permanency selection and implementation in May 2022. It recommended termination of Father's parental rights and implementation of adoption as the permanent plan for D.B. and her siblings. The section 366.26 report also contained the Agency's permanency planning assessment for D.B. and her siblings.

D.B. was living with the out-of-state aunt. She was a healthy and vocal child who was up to date on her medical and dental care. She participated in weekly occupational therapy as well as therapeutic services to address her past trauma and Mother's unexpected death. D.B.'s behavioral issues had stabilized. She followed an established routine for completing morning tasks

6

including dressing, brushing her teeth, and making her bed. She remained connected with her younger siblings through periodic visits to San Diego County and virtual visits.

The Agency assessed D.B. as "generally adoptable based on her numerous appealing characteristics such as her young age, beautiful physical appearance, and appropriate physical, mental, and emotional development." The Agency described D.B. as a creative and lovable four-year-old child. She initially presented as reserved, but was quick to start a conversation when she felt comfortable. She was specifically adoptable by her aunt, who expressed a desire and commitment to provide D.B. with a permanent home, free from violence. However, the Agency also stated that "[b]ased on her generic characteristics, [D.B.] would meet the qualifications for numerous adoptive families who are in search of someone matching similar characteristics." The Agency had no apprehension about finding a home for D.B. "if a home is needed in the future."

B.    *Supplemental Petition*

In May 2022, before the scheduled contested section 366.26 hearing, the out-of-state aunt notified the Agency that her health had declined to the point that she could no longer provide care to D.B. The Agency filed a supplemental petition under section 387 alleging that D.B.'s relative placement was no longer appropriate because the relative caregiver could no longer provide her care. The Agency recommended modification of the disposition order to place D.B. in the home of a foster caretaker.[3]

---

[3]    Section 387, subdivision (a), states in pertinent part: "An order changing or modifying a previous order by removing a child from the physical custody of a . . . relative . . . and directing placement in a foster home . . . shall be made only after noticed hearing upon a supplemental petition." When the prior placement was with a relative, the petition must contain a

7

The aunt worked with the Agency to create a transition plan for D.B. Both the aunt and uncle's family worked with the Agency to identify a new placement for D.B. They all felt D.B. would do best in a home where she is the only child and able to have the undivided attention of her caregivers. The Agency identified an approved "resource family" who was ready and willing to accept placement of D.B. The family had been through the Resource Family Approval (RFA) process to be considered an RFA home. (§ 16519.5, subd. (c).)

At a hearing on the supplemental petition in June 2022, the juvenile court found the Agency made a prima facie showing that D.B. was a child described by section 387 and the previous disposition placing her with the aunt was no longer appropriate. D.B. was placed with the resource family the same day.

C. *Addendum Reports*

The Agency submitted an addendum report for D.B.'s contested permanency planning hearing. It reported that D.B. had thrived with the one-on-one attention her aunt provided. But when the aunt's health declined and she was no longer able to provide the same level of attention, D.B. began to regress.

The resource parents met with D.B.'s relatives for an extended period and took notes about her likes and dislikes. The resource family expressed their commitment to maintaining a relationship between D.B. and her siblings, and enrolled D.B. in the same school as her siblings so they can see each other daily. They also discussed monthly visits to allow D.B. to spend time with her siblings. The juvenile court granted the Agency's request to

statement of facts "sufficient to show that the placement is not appropriate in view of the criteria in [s]ection 361.3." (§ 387, subd. (b).)

continue the permanency planning hearing to allow it to continue to assess the most appropriate plan for D.B.

In August 2022, the Agency reported that D.B. was thriving in her new placement with the resource family. D.B. appeared to be confident and loving as she continued to work through her trauma issues. The Agency reported that although D.B. had been in her placement for less than two months, it was evident the resource family was committed to providing D.B. with permanency through adoption. The resource parents were committed to helping D.B. stay connected to her siblings by arranging for family outings where D.B. could visit and play with her siblings and cousins. They enrolled D.B. in various activities to increase her social skills, including swimming, jujitsu, and gymnastics. D.B. was also growing more independent and could play by herself for longer periods of time.

The Agency reported there were "no changes to the assessment dated [May 19, 2022]. [D.B.] is specifically adoptable as her current resource parents are committed to providing [D.B.] permanency through adoption. [D.B.] has been able to progress and is thriving in her current placement." D.B. was comfortable in her new placement and was progressing in all areas of development with "the love and stability provided by her current caregivers." The Agency stated D.B.'s current placement was "the most appropriate placement" and that it was in her best interest to terminate Father's parental rights and implement the permanent plan of adoption.

D.    *Combined Section 387 and Contested Section 366.26 Hearing*

At the combined contested hearing in August 2022, County Counsel explained that the Agency filed the supplemental petition to elevate D.B.'s level of care from a relative to an approved resource family foster home. County Counsel argued D.B. was specifically and generally adoptable by clear

9

and convincing evidence, asserting: "She's sociable, she doesn't have any special needs, and she's adjusted well to her new placement. The current caregiver wants to adopt her. If that placement didn't work out and we had to go elsewhere, she would be generally adoptable as well based on her characteristics."

Father's counsel objected to moving D.B. anywhere except with him and requested the court deny the supplemental petition. His counsel also asked the court to find the parent/child bond exception to adoption applied because he plays a parental role in her life even though their visits have been virtual. Father's counsel asked the court to order a lesser permanent plan than adoption. Notably, he did not object to the Agency's adoption assessment or addendum reports.

Counsel for D.B. urged the court to sustain the section 387 petition and follow the Agency's recommendations for adoption as the permanent plan. Counsel stated that D.B. had been exposed to trauma throughout her short life, including exposure to violent instances in her parents' care, Mother's sudden passing, and changes in placement. D.B. interacted with Father during virtual visits, but he did not provide her with security or understanding. Father had a pattern of inconsistent visitation and, when they did visit virtually, Father had difficulty listening to and understanding D.B. D.B. was making progress when provided with stability and structure where she could "just be a kid and feel at home." D.B.'s counsel stated that the current resource family wanted to provide her with a permanent home.

The juvenile court read and considered all of the Agency's reports and admitted them into evidence. The court made a true finding on the section 387 petition. It found D.B.'s current placement was appropriate and that it was likely that D.B. would be adopted if parental rights were terminated.

10

The court found no exception to adoption existed. Specifically, the court found Father had not visited D.B. consistently and the value of a permanent, secure, and stable placement outweighed any benefit of D.B.'s relationship with Father. The court terminated Father's parental rights and declared D.B. free from his custody and control. The court referred her to the Agency for adoptive placement, which the court found to be in D.B.'s best interest and the preferred plan. The court set a postpermanency planning hearing for January 30, 2023, to finalize the permanent plan.

## DISCUSSION

### I.

### *General Principles Regarding Adoptability*

When a parent fails to reunify with his or her dependent child and reunification services are terminated, "the focus shifts to the needs of the child for permanency and stability." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.) The juvenile court must set a selection and implementation hearing pursuant to section 366.26 to provide a stable, permanent home for the child. (§ 366.26, subd. (b).) Section 366.26 requires the juvenile court to determine based on the Agency's assessment "and any other relevant evidence, by a clear and convincing standard, that it is likely the child will be adopted." (*Id.* at subd. (c)(1).) "If so, and if the court finds that there has been a previous determination that reunification services be terminated, then the court shall terminate parental rights to allow for adoption," unless a parent shows termination would be detrimental to the child for a reason specified in the statute. (*In re Caden C.* (2021) 11 Cal.5th 614, 630–631.)

In preparation for the section 366.26 hearing, the juvenile court "is required to direct the Agency to prepare an assessment report of the child as part of its report to the court. [Citations.] The assessment report must

11

address the child's medical, developmental, scholastic, mental and emotional status; analyze the likelihood the child will be adopted if parental rights are terminated; describe the efforts made to identify a prospective adoptive parent or legal guardian for the child; and provide a preliminary assessment of the eligibility and commitment of any identified prospective adoptive parent or legal guardian. (§ 366.21, subd. (i)(1); [*In re Valerie W.* (2008) 162 Cal.App.4th 1*,* 11–12.].) 'The assessment report is "a cornerstone of the evidentiary structure" upon which the court, the parents and the child are entitled to rely.' " (*In re Michael G.* (2012) 203 Cal.App.4th 580, 590 (*Michael G.*).)

"The issue of adoptability posed in a section 366.26 hearing focuses on the *minor*, e.g., whether the minor's age, physical condition, and emotional state make it difficult to find a person willing to adopt the minor." (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649 (*Sarah M.*).) "All that is required is clear and convincing evidence of the *likelihood that adoption will be realized within a reasonable time.*" (*In re Zeth S.* (2003) 31 Cal.4th 396, 406, italics added.) "It is not necessary that the child already be in a potential adoptive home or that there be a proposed adoptive parent ' "waiting in the wings." ' " (*In re A.A.* (2008) 167 Cal.App.4th 1292, 1311 (*A.A.*).)

We review a juvenile court's adoptability finding for substantial evidence. "[W]e determine whether the record contains substantial evidence from which the court could find clear and convincing evidence that the child was likely to be adopted within a reasonable time." (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1232.) "We give the court's adoptability finding the benefit of every reasonable inference and resolve any evidentiary conflicts in favor of the judgment of the [juvenile] court." (*Ibid.*) We do not "reweigh the evidence, evaluate the credibility of witnesses or indulge in inferences

contrary to the findings of the trial court." (*Michael G., supra*, 203 Cal.App.4th at p. 589.)

II.

*Father Forfeited His Claims About the Adequacy of the Agency's Assessments*

Father contends substantial evidence does not support the juvenile court's finding that D.B. is adoptable because the Agency did not either conduct an entirely new assessment of the resource family as prospective adoptive parents or the prior assessment was "egregiously inadequate." He contends he was denied due process because the assessments did not provide an assessment of the eligibility or commitment of the resource family as prospective adoptive parents. We agree with the Agency that Father forfeited his claims about the adequacy of the Agency's assessments by failing to object in the proceedings below.

The Agency submitted a section 366.26 report in May 2022 with an assessment of D.B. and her siblings. This included an analysis of her medical, developmental, educational, mental and emotional status. It described her placement history and the history of the contact with her family. It analyzed her likelihood of adoption and determined she was "generally adoptable based on her numerous appealing characteristics" which would meet the qualifications for "numerous adoptive families." At the time, she was also specifically adoptable because her aunt was committed to providing her with a permanent home.

After D.B. was placed with the resource family, the Agency submitted two addendum reports. The June 2022 report described the efforts and commitment the resource family made to learn about D.B. and to maintain her relationship with her siblings. Two months later, the Agency submitted another addendum report describing how D.B. was thriving in her new

13

placement. The addendum report stated the resource parents were committed to providing D.B. with permanency through adoption and to maintain her connection with her siblings. The Agency described how D.B. was becoming more independent and confident as a result of the resource parents' efforts to engage D.B. in various activities to build her peer relationships and social skills. The Agency reported there were "no changes" to the initial adoption assessment from May 2022. In addition to her general adoptability, the Agency reported that D.B. remained "specifically adoptable as her current resource parents are committed to providing [D.B.] permanency through adoption." The Agency reported D.B. was "comfortable in her placement" and she had progressed in all areas of development with "the love and stability provided by her current caregivers."

As the Agency concedes, the addendum reports did not include a fulsome discussion about the prospective adoptive family with each of the items listed in section 366.22, subdivisions (i)(1)(D) [non-inclusive factors regarding eligibility and commitment of prospective adoptive parent] and (E) [factors regarding the relationship of the child to the prospective adoptive parent]. However, the reports generally described the resource family's commitment to adoption, their commitment to maintaining and building a relationship between D.B. and her family, and how D.B. was not only progressing, but thriving from the loving and stable relationship they provided in the short time she was placed with them.

"Deficiencies in an assessment report go to the *weight* of the evidence, and 'if sufficiently egregious may impair the basis of a court's decision to terminate parental rights.' [Citation.] An adoption assessment is sufficient if it substantially complies with the requirements of the assessment statute. [Citation.] '[E]ven if the assessment is incomplete in some respects, the court

14

will look to the totality of the evidence.' " (*In re M.M.* (2022) 81 Cal.App.5th 61, 67, italics added.)

Father forfeited any arguments about the adequacy of the Agency's assessments of the prospective adoptive resource family when he failed to object or raise such challenges at trial. (*In re Joshua G.* (2005) 129 Cal.App.4th 189, 200, fn. 12 (*Joshua G.*); *In re Urayna L.* (1999) 75 Cal.App.4th 883, 886 [a parent forfeited the right to challenge the adequacy of an adoption report by failing to raise the issue with the trial court].) "A party forfeits the right to claim error as grounds for reversal on appeal when he or she fails to raise the objection in the trial court. [Citations.] Forfeiture . . . applies in juvenile dependency litigation and is intended to prevent a party from standing by silently until the conclusion of the proceedings." (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 221–222.)

Father cannot avoid forfeiture by arguing the assessments denied him due process. As we explained in *Crystal J.* (1993) 12 Cal.App.4th 407, 413, when an assessment report is prepared and addresses the principal questions at issue in a proceeding, "errors or omissions in the report cannot be characterized in terms of denial of due process." (*Ibid.*) Instead, they merely go to the weight of the evidence. (*Ibid.*) In *Crystal J.*, the appellate court determined the parent forfeited claims about deficiency of the assessment by failing to object. (*Id.* at pp. 411–412.) There, the court and the parties appeared unconcerned at the time of the hearing regarding the financial stability or the background of the potential adoptive parents. Considering the record as a whole, the appellate court determined there was ample evidence to support the juvenile court's findings and judgment. (*Id.* at p. 413.)

As in *In Crystal J.*, the parties and the court here appeared satisfied that the resource family was eligible and committed to D.B. as an adoptive family at the time of the hearing. This may be explained by the fact that the addendum reports indicated the new prospective adoptive family already had RFA approval. As the Agency pointed out in its briefing on appeal, the extensive RFA process requires applicants to undergo background checks and home approval, as well as to demonstrate financial stability and an understanding of the needs of children who have experienced abuse and neglect for safety, permanency, and wellbeing. (See § 16519.5, subds. (c), (d).) Father was afforded notice and an opportunity to be heard on the issue of the Agency's assessment and D.B.'s adoptability after the Agency identified a new prospective adoptive home. His failure to raise concerns about the adequacy of the assessment of the resource family forfeited such claims. (See *Crystal J., supra*, 12 Cal.App.4th at p. 413.)

III.

*Substantial Evidence Supports the Juvenile Court's Adoptability Finding*

To the extent Father argues that substantial evidence does not support the juvenile court's finding of adoptability, forfeiture does not apply and we consider the issue. (*Joshua G.*, *supra*, 129 Cal.App.4th at p. 200, fn. 12; *A.A.*, *supra*, 167 Cal.App.4th at p. 1317 [distinguishing for purposes of forfeiture between a challenge to the adequacy of an adoption assessment and a challenge to the sufficiency of the evidence of adoptability].) We conclude there is substantial evidence to support the court's adoptability finding.

Father's challenges to the assessment and addendum essentially focus on whether there was a sufficient analysis of the suitability of the resource family to adopt D.B. However, "[i]f the child is considered generally adoptable, we do not examine the suitability of the prospective adoptive

16

home." (*In re B.D., supra*, 159 Cal.App.4th at pp. 1231–1232.)  "Usually, the fact that a prospective adoptive parent has expressed interest in adopting the minor is evidence that the minor's age, physical condition, mental state, and other matters relating to the child are not likely to dissuade individuals from adopting the minor.  In other words, a prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent *or by some other family*."  (*Sarah M.*, *supra*, 22 Cal.App.4th at pp. 1649–1650.)

"In some situations, not applicable here, a minor who is not generally adoptable because of age, poor physical health, physical disability or emotional instability may nevertheless be adoptable because a prospective adoptive family has been identified as willing to adopt the child. [Citation.]  'When a child is deemed adoptable *only* because a particular caretaker is willing to adopt, the analysis shifts from evaluating the characteristics of the child to whether there is any legal impediment to the prospective adoptive parent's adoption and whether he or she is able to meet the needs of the child.' "  (*In re R.C.* (2008) 169 Cal.App.4th 486, 494.)  This is not such a situation.  There is no indication D.B. would be difficult to place.

There is ample evidence from the initial assessment and the addendum reports showing that D.B. was generally adoptable based on her characteristics.  She is a young, attractive child in good health who presents as a confident and loving.  She is progressing well in all aspects of her development.  The Agency stated these generic characteristics would meet the qualifications for "numerous adoptive families" and it had no doubt it could find an appropriate home for D.B. if it needed to do so.  Father does not seriously dispute the fact that D.B. was generally adoptable.

He contends, however, that a child's general adoptability should not relieve the Agency from its statutory obligation to prepare an adoption assessment under section 366.21 when a new prospective family is identified. We do not disagree. However, the Agency here prepared an adoption assessment along with addendum reports updating that assessment after the change in placement.

We need not reach the issue of whether it would have been a better practice for the Agency to prepare a new or better assessment after it identified a new prospective adoptive family because, as previously discussed, Father forfeited his claims about any deficiencies in the assessment by failing to object. Father's reliance on *In re Valerie W.*, *supra,* 162 Cal.App.4th at pages 13 through 16, "in which the appellate court determined an assessment statutorily inadequate resulting in a conclusion that substantial evidence did not support an adoptability finding, . . . overlook[s] the fact that the parties in *Valerie W.* did challenge the assessment's adequacy in the trial court. [Citation.] Consequently, *Valerie W.* does not persuade us to consider [Father's] criticisms for the first time on appeal." (*A.A.*, *supra*, 167 Cal.App.4th at p. 1317.)

Additionally, "a section 366.26 hearing does not provide a forum for the minor['s] parent to contest the 'suitability' of a prospective adoptive family. Rather, what is required is clear and convincing evidence of the likelihood that the child[ ] will be adopted within a reasonable time either by the prospective adoptive family or some other family." (*In re Scott M.* (1993) 13 Cal.App.4th 839, 844.) "If inquiry into the suitability of prospective adoptive parents were permitted in section 366.26 hearings, we envision that many hearings would degenerate into subjective attacks on all prospective adoptive families in efforts to avoid termination of parental rights. Such a result is

18

not envisioned by the statutory scheme.  Rather, the question of a family's suitability to adopt is an issue which is reserved for the subsequent adoption proceeding."  (*Ibid.*)

Despite any purported deficiencies in the assessment reports here, there was substantial evidence to support the finding that D.B. is generally adoptable and would be adopted within a reasonable time after the termination of parental rights.  (*Michael G., supra*, 203 Cal.App.4th at p. 593.)

DISPOSITION

The order is affirmed.

DO, J.

WE CONCUR:

HUFFMAN, Acting P. J.

BUCHANAN, J.